1 | Jeremiah D. Weiner (CSBA No. 226340)
Douglas MacCourt (OSBA No. 890780)
2 | *Admitted Pro Hac Vice*
Lucas T. Christian (CSBA No. 320014)
3 | Rosette, LLP
193 Blue Ravine Road
Suite 255
4 | Folsom, California 95630
Telephone: (916) 353-1084
5 | Facsimile: (916) 353-1085
*Attorneys for Plaintiff*
6 | *The Klamath Tribes*

7

**UNITED STATES DISTRICT COURT**

8

**NORTHERN DISTRICT OF CALIFORNIA**

9

10 | THE KLAMATH TRIBES, a federally recognized Indian Tribe,

| Case No. 3:18-cv-03078-WHO

11 | Plaintiff,

| **PLAINTIFF'S COMBINED REPLY TO FEDERAL DEFENDANTS' AND INTERVENOR-DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION**

12 | vs.

13 | UNITED STATES BUREAU OF RECLAMATION; UNITED STATES FISH & WILDLIFE SERVICE; NATIONAL MARINE FISHERIES SERVICE

| Hearing Date: July 20, 2018
Time: 9:00 AM
Courtroom: 2, 17th Floor
Judge William H. Orrick

14

15

16 | Defendants.

17

18

19

20

21

22

23

24

## TABLE OF CONTENTS

I.      Introduction ................................................................................................1

II.     Standard & Scope Of Review ......................................................................1

III.    The Klamath Tribes Will Suffer Irreparable Injury During The Pendency Of This Litigation If An Injunction Is Not Granted ................................................................3

IV.     Plaintiff Has Diligently Pursued Its Claims To Save The C'waam And Koptu .................7

V.      Venue Is Proper In This District .................................................................11

VI.     The Klamath Tribes Are Likely To Prevail On The Merits Of Count I .......................................................................................12

VII.    The Klamath Tribes Are Likely To Prevail On The Merits Of Count Ii ....................................................................................16

        A.  *Federal Defendants Fail to Raise any Meaningful Argument in Support of Their Position that The Klamath Tribes are Not Likely to Prevail on Count II* .........................................17

        B.  *Defendants-Intervenors Likewise Fail to Establish that The Klamath Tribes are Not Likely to Prevail on Count II* .........................................23

VIII.   The Klamath Tribes Are Likely To Prevail On The Merits Of Count Iii .........................26

        A.  *Count III is Not "Jurisdictionally Moot"* .................................26

        B.  *Count III is Ripe for Review* .........................................28

        C.  *Count III States a Cognizable Claim against Each Federal Defendant* .....................29

IX.     The Balance Of Equities And The Public Interest Both Favor The Requested Injunction ........................................................29

X.      A Bond Is Neither Necessary Nor Appropriate ...........................................34

XI.     Conclusion ..............................................................................................36

## **TABLE OF AUTHORITIES**

**Cases**

*Aluminum Co. of Am. v. Adm'r, Bonneville Power Admin.*, 175 F.3d 1156 (9th Cir. 1999) .........18

*Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife,* 273 F.3d 1229 (9th Cir.2001) ......................1

*Benisek v. Lamone*, 138 S.Ct. 1942 (2018)............................................................................10,11

*Center for Biological Diversity v. U.S. Bureau of Reclamation*,
    No. 6:15-CV-02358-JR, 2016 WL 9226390 (D. Or. Apr. 6, 2016)..................................28,29,32

*Cottonwood Envtl. Law Ctr. v. Forest Serv.,* 789 F.3d 1075 (9th Cir. 2015)..............................29

*Defs. Of Conewango Creek v. Echo Developers, LLC*, 06-242E
    2007 WL 3023927 (W.D. Penn. Oct. 12, 2007) ..............................................................11

*Defenders of Wildlife v. Bernal*, 204 F.3d 920 (9th Cir. 2000).........................................................1

*Defs. of Wildlife v. Bureau of Ocean Energy Mgmt.*, 684 F.3d 1242 (11th Cir. 2012) ...............22

*Defenders of Wildlife v. Martin*, 454 F.Supp.2d 1085 (E.D. Wash. 2006)..............................26,27

*Diaz v. Brewer*, 656 F.3d 1008 (9th Cir. 2011) ...........................................................................34

*Envtl. Prot. Info. Ctr. v. Simpson Timber Co.*, 255 F.3d 1073 (9th Cir. 2001) ........................4, 22

*Lands Council v. Forester of Region One of the U.S. Forest Serv.*
    395 F.3d 1019 (9th Cir. 2005) ...................................................................................................3

*Native Fish Soc. v. Nat'l Marine Fisheries Servs.*, 992 F. Supp. 2d 1095 (D. Or. 2014) .............26

*Marsh v. Oregon Natural Resources Council*, 490 U.S. 360 (1989)..............................................3

*Mt. Graham Red Squirrel v. Madigan*, 954 F.2d 1441 (9th Cir. 1992) .....................................4,22

*Or. Natural Desert Ass'n v. Tidwell*, 716 F.Supp.2d 982 (D. Or. 2010) ........................................1

*Pacificans for a Scenic Coast v. Cal. Dep't of Transportation*,
    204 F. Supp. 3d 1075, 1084 (N.D. Cal. 2016) ............................................................................1

*People of State of Cal. ex rel. Van De Kamp v. Tahoe Regl. Plan. Agency*,
    766 F.2d 1319 (9th Cir. 1985), *amended*, 775 F.2d 998 (9th Cir. 1985)....................................35

*Pyramid Lake Paiute Tribe of Indians v. U.S. Dep't of Navy*, 898 F.2d 1410 (9th Cir. 1990) ......18

*Resources Ltd., Inc. v. Robertson*, 35 F.3d 1300 (9th Cir.1994) ...................................................18

*San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581 (9th Cir. 2014)..................3,17,17

*S.W. Ctr. For Biological Diversity v. U.S. Forest Serv.*, 100 F.3d 1443 (9th Cir. 1996) .................3

*Sierra Club v. United States Army Corps of Eng'rs*, No. Civ.A. 05–1724JAP
    2005 WL 2090028 (D. NJ Aug. 29, 2005) ...............................................................................11

*Sierra Club v. Yeutter,* 926 F.2d 429 (5th Cir.1991) ..............................................................1,23,24

*Stop H-3 Ass'n v. Dole*, 740 F.2d 1442, 1460 (9th Cir. 1984) ......................................................18

*Stout v. U.S. Forest Serv.*, 869 F. Supp. 2d 1271 (D. Or. 2012).......................................................1

*Swan View Coal., Inc. v. Turner*, 824 F. Supp. 923 (D. Mont. 1992) ..............................................1

*Tennessee Valley Auth. v. Hill*, 437 U.S. 153 (1978)..............................................................29,30

*Thomas v. Peterson,* 753 F.2d 754 (9th Cir. 1985)..............................................................21

*W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472 (9th Cir. 2011).........................................2

*Washington Toxics Coalition v. EPA*, 413 F.3d 1024 (9th Cir. 2005)............................................2

*Western Watersheds Project v. Kraayenbrink*, 632 F.3d 472 (9th Cir. 2011) ...................................

*Yurok Tribe v. United States Bureau of Reclamation*, 231 F. Supp. 3d 450
  (N.D. Cal. 2017) *order clarified sub nom. Tribe v. United States Bureau of*
  *Reclamation*, No. 16-CV-06863-WHO, 2018 WL 2010998 (N.D. Cal. Apr. 30, 2018)................

**<u>Statutes</u>**

16 U.S.C. § 1536(a)(2)...............................................................................................

16 U.S.C. § 1540(g)(1) ...............................................................................................

16 U.S.C. § 1540(g)(1)(A)...........................................................................................

**MEMORANDUM OF POINTS AND AUTHORITIES**

### I.      Introduction

The facts of this controversy, as developed thus far, demonstrate the Klamath Tribes will suffer irreparable injury in the absence of the requested injunction, they are likely to succeed on the merits of Counts I, II, and III, and the balance of equities and public interest favor granting the requested preliminary injunction.

### II.     Standard & Scope of Review

In general, claims arising under the Endangered Species Act ("ESA") are reviewed under the Administrative Procedure Act's ("APA") "arbitrary and capricious" standard.  *Pacificans for a Scenic Coast v. Cal. Dep't of Transp.*, 204 F. Supp. 3d 1075, 1084 (N.D. Cal. 2016) ("[E]ven when a claim is brought directly under the ESA's citizen-suit provision, the APA's arbitrary and capricious' standard of review applies."). This standard is deferential to federal agency decision making insofar as it requires a reviewing court to uphold agency decisions which are "founded on a rational connection between the facts found and the choices made." *Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife*, 273 F.3d 1229, 1243 (9th Cir.2001). However, "de novo review of a § 9 takings claim," with no deference to an offending agency, "is appropriate where the § 9 claim 'does not involve an examination of the consultation process between [the action agency] and [the consulting agency].'" *Swan View Coal., Inc. v. Turner*, 824 F. Supp. 923, 937 (D. Mont. 1992) (quoting *Sierra Club v. Yeutter,* 926 F.2d 429, 438 n.13 (5th Cir.1991)); *accord Stout v. U.S. Forest Serv.*, 869 F. Supp. 2d 1271, 1276 (D. Or. 2012). Rather, in such cases, a plaintiff must "prov[e] by a preponderance of the evidence" that unpermitted take is likely to occur. *Defenders of Wildlife v. Bernal*, 204 F.3d 920, 925 (9th Cir. 2000).  This is true irrespective of whether the defendant is a federal agency.  *See, e.g., Or. Natural Desert Ass'n v. Tidwell*, 716 F.Supp.2d 982, 1005 (D. Or. 2010). Thus, to the extent the Klamath Tribes' Section 9 takings

claims do not turn on a question of agency consultation or the exercise of agency expertise, this Court should employ a de novo standard of review.

Furthermore, the incorporation of the APA's arbitrary and capricious standard of review into certain claims brought under the ESA's citizen's suit provision does not carry with it the obligation to limit review of an agency's decision to the administrative record. As this Court has explained, where "the ESA provides a citizen suit remedy for plaintiffs' . . . claim, the APA's record review provision does not apply and 'evidence outside the administrative record [may be considered] for the limited purposes of reviewing Plaintiffs' ESA claim.'" *Yurok Tribe v. United States Bureau of Reclamation*, 231 F. Supp. 3d 450, 469 (N.D. Cal. 2017), *order clarified sub nom. Yurok Tribe v. United States Bureau of Reclamation*, No. 16-CV-06863-WHO, 2018 WL 2010998 (N.D. Cal. Apr. 30, 2018) (quoting *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 497 (9th Cir. 2011)); *see also Washington Toxics Coalition v. EPA*, 413 F.3d 1024, 1034 (9th Cir. 2005)("Because [the ESA citizen suit provision, 16 U.S.C. § 1540(g)(1)] independently authorizes a private right of action, the APA does not govern the plaintiffs' claims."). Thus, because each of the of the Klamath Tribes' Counts I–III as against Defendant United States Bureau of Reclamation ("Reclamation") arise under the ESA's citizen suit provision, the scope of this Court's review with respect to those claims is <u>not</u> limited to the administrative record. *See Western Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 496–97 (9th Cir. 2011) ("[W]e may consider evidence outside the record for the limited purpose of reviewing Plaintiffs' ESA claims."); *Yurok Tribe*, 231 F. Supp. 3d at 468–69.

Federal Defendants are therefore incorrect when they seek to limit the Court's ability consider the Buettner Declaration, ECF No. 13–3. [ECF No. 44 at 47]. They concede, as they must, that the Declaration may be considered for the purpose of demonstrating the irreparable harm the Klamath Tribes will suffer in the absence of the requested preliminary injunction.  But they assert that it cannot be used for any other purpose, such as to show that "the 2013 BiOp and/or the ITS fail to meet the

1   requirements of ESA Section 7(a)(2)."  [*id.* at 49].  This misconstrues the nature and basis of the Tribes'

2   claims. The Tribes are not before this Court challenging the substance of the 2013 BiOp itself. Rather,

3   the Tribes' claims are predicated on the fact that it is Reclamation's actions and the hydrologic

4   conditions that have occurred *since* the issuance of the 2013 BiOp that render Reclamation's operation

5   of the Project violative of Sections 7 and 9 of the ESA, and that triggered Reclamation's duty to

6   reinitiate consultation with United States Fish & Wildlife Service ("USFWS") and National Marine

7   Fisheries Services ("NMFS") regarding the effects of the Klamath Irrigation Project ("Project") on the

8   C'waam and Koptu. These factors could not, of course, have been part of the administrative record

9   related to the 2013 BiOp, and thus there is no basis for so limiting the materials that may be considered

10  in this case.

11          On the facts of the Klamath Tribes' instant suit, therefore, the record review cases cited by the

12  Federal Defendants in support of their argument for inadmissibility are inapposite.[1] The Declaration of

13  Mark Buettner or any other extra-record material may be fully considered as the Court deems relevant.

14  **III.    The Klamath Tribes Will Suffer Irreparable Injury During the Pendency of this Litigation If an Injunction Is Not Granted.**

15          Federal Defendants and Defendant-Intervenors argue that business as usual is perfectly

16  acceptable, and that the Klamath Tribes will not suffer an irreparable injury during the pendency of this

17  lawsuit in the absence of the requested injunction.  The Tribes wish that they could share the opposing

18  parties' confidence in the resilience and continued viability of the C'waam and Koptu population in

19  Upper Klamath Lake ("UKL") under current conditions.  But, as the best available science and the real-

20  world effects of the Klamath Irrigation Project ("Project") under the 2013 BiOp demonstrate, they

21

22  _____

23  [1]*Marsh v. Oregon Natural Resources Council*, 490 U.S. 360 (1989), *Lands Council v. Forester of Region One of the U.S. Forest Serv.*, 395 F.3d 1019 (9th Cir. 2005), and *S.W. Ctr. For Biological Diversity v. U.S. Forest Serv.*, 100 F.3d 1443 (9th Cir. 1996) are all NEPA cases and thus are particularly off point.  *San Luis & Delta-Mendota*

24  *Water Auth. v. Jewell*, 747 F.3d 581 (9th Cir. 2014) involved a challenge to the threshold adequacy of a biological opinion not—as here—its implementation, and thus is no more applicable.

cannot. The species are at imminent risk of a catastrophic die-off leading to their extirpation in UKL [Declaration of Mark Buettner in Support of Combined Reply at ¶¶ 20–30, attached hereto as **Exhibit A**]. Furthermore, "[l]oss of the UKL LRS and SNS populations would put both species at a high risk of extinction…." [ECF No. 13-2 at § 7.4.4 (2013 BiOp)].   This would cause irreparable injury to the Klamath Tribes.

Federal Defendants assert that, to be entitled to an injunction, the Klamath Tribes must show that this irreparable injury is traceable directly to a flaw in the 2013 BiOp or ITS. [ECF No. 44 at 42]. But this argument assumes that the 2013 BiOp is still entitled to a presumption of validity, a presumption this Court expressly rejected in the *Hoopa Valley* and *Yurok* cases. 231 F. Supp. 3d at 476-77. While Federal Defendants might try to distinguish that holding on the ground that it was predicated on the exceedance of the coho salmon incidental take statement and not specifically on failings related to the C'waam or Koptu, that position would ignore the direct hydrological connections between UKL and the Klamath River as well as the fact that the 2013 BiOp was a joint product of NMFS and USFWS.  [ECF No. 13-1 at § 2.2 (2013 BiOp); *see also* ECF No. 33 at 4–10].   Furthermore, the fact that consultation regarding a replacement for the 2013 BiOp is underway [ECF No. 44-1 at 4], means that Federal Defendants' argument about the presumption of validity conflicts with the same Ninth Circuit precedent identified by this Court in *Hoopa Valley* and *Yurok*.  *See* 231 F. Supp. 3d at 477 (citing *Envtl. Prot. Info. Ctr. v. Simpson Timber Co.*, 255 F.3d 1073, 1078 (9th Cir. 2001); *Mt. Graham Red Squirrel v. Madigan*, 954 F.2d 1441, 1451 (9th Cir. 1992)).  In addition, as the Federal Defendants have acknowledged, "new and additional science on suckers [C'waam and Koptu] has come to light since the signing of the 2013 BiOp."  [ECF No. 44-1 at 4]; *see* 50 C.F.R. § 402.16(b).  A presumption of validity is, therefore, no more warranted here than it was in the *Hoopa Valley* and *Yurok* cases.

Even were such a presumption in order, it would be rebutted by the actual events that have occurred since the 2013 BiOp was issued. Contrary to Federal Defendants' assertions [ECF No. 44 at

42], Reclamation's operation of the Project during the last five-plus years has not, in fact, been consistent with the 2013 BiOp and the Incidental Take Statement ("ITS") for C'waam and Koptu. Rather, the hydrologic conditions that have occurred in the basin since the issuance of the 2013 BiOp, and Reclamation's continued operation of the Project at or below rather than regularly "well above" the applicable end-of-month thresholds, [ECF No. 13-2 at § 13.3.2, T&C 1c (2013 BiOp & ITS)], have subjected the C'waam and Koptu to habitat conditions outside those analyzed in the 2013 BiOp. [Exhibit A at ¶¶ 3–15]. While USFWS may be satisfied that the procedural steps Reclamation took after each breach of the thresholds were individually adequate and that a single missed threshold "does not represent the type of chronic harm that would result in jeopardy to the continued existence of suckers in the lake," [ECF No. 44-1 at 4], the overall trends that have emerged during the five years of Reclamation's implementation of the 2013 BiOp demonstrate both UKL elevations consistently lower than those optimistically forecast in the 2013 BiOp and the continued dwindling of both C'waam and Koptu populations to levels that exacerbate the risk of extinction that the 2013 BiOp itself identified. [ECF No. 13-2 at §7.10.6 ("[T]he [C'waam] and the [Koptu] are critically endangered due to the lack of population resiliency and redundancy, and are at a high risk of extinction unless and until sufficient amounts of recruitment occur into the adult breeding populations of both species to more normalize population age structure, demographic patterns, and relative distribution within the Klamath River Basin")].

Neither the C'waam nor the Koptu in UKL have enjoyed meaningful recruitment since the 1990s, a trend Reclamation's operations under the 2013 BiOp has not changed. The vast majority of the remaining fish have already exceeded their average lifespan and are beginning to approach their maximum life expectancies. [ECF No. 13-3 at ¶¶ 11 & 29)]. As these fish continue to advance in age, the risks they face—including this year—continue to multiply, a fact the 2013 BiOp itself made plain. [ECF No. 13-2 at § 7.4.4 ("The risk of extirpation becomes even more likely given that the relatively

advanced age of most individuals in UKL will likely result in an acceleration of declining trends during the BiOp term as individuals begin to succumb to old age")]. The massive fish kills of the 1990s exacted their greatest toll on older members of the species. [Exhibit A at ¶¶ 22–23]. These die-offs did not become an extinction-level event thanks to successful recruitment into both the C'waam and Koptu populations in the immediately preceding years and the larger overall populations at the time. [*Id.* ¶¶ 23–24] Due to the lack of appreciable recruitment in the last two decades, and the continued decline of abundance over the intervening years [*see* ECF No. 13-2 at § 7.4.4 (2013 BiOp)], no such buffer presently exists to insulate the species, particularly the Koptu, against another large-scale die-off. [*Id.* ¶¶ 25]. The 2013 BiOP itself recognized this fact. "A die-off of adult suckers in UKL, similar to those that occurred in the 1990s, would be catastrophic, especially for [Koptu] because of its low abundance." [ECF No. 13-2 at § 10.1].  This risk is exacerbated by the poor water quality these elderly populations suffered through last summer and are presently contending with another year of terrible UKL water quality. [Exhibit A at ¶¶ 26–28].

In arguing against the need for the Conservation Levels as a remedy for the irreparable injury of the loss of a viable population of C'waam or Koptu in UKL, the Federal Defendants assert that the Conservation Levels will redress neither the species failure to recruit nor UKL's poor water quality. [ECF No. 44 at 42-43]. But these arguments are factually incorrect as they focus only on linear relationships rather than acknowledging the complex and multivariate nature of the relationship among UKL levels and other factors that affect the C'waam and Koptu. [Exhibit A at ¶¶ 38–43]. The Federal Defendants and Defendant-Intervenors have simply ignored more recent research conducted by Dr. Jacob Kann and W.W. Walker demonstrating there is a significant causal relationship between water quality and UKL elevations, [ECF No. 13–3 at ¶¶ 108–166], instead relying on earlier studies which they find more convenient for their interests. [*See, e.g.*, ECF No. 38 at 13, 33–35; ECF No. 44 at 43–44]. This is so despite the fact that Dr. Kann is a federal contractor. [Exhibit A at ¶ 43]. They also ignore the

critical point that the late summer Conservation Levels the Tribes seek through this preliminary injunction motion are acutely focused on "ensur[ing] high survival rates of adult suckers by providing adequate lake levels to ensure that the suckers can access the important water quality refuge provided by Pelican Bay." [ECF No. 13-3 at ¶ 173]. Both Pelican Bay and the Fish Banks area adjacent to it are vital water quality refuges for adult C'waam and Koptu during periods of poor water quality and die-off events. [Exhibit A at ¶ 32]. Moreover, once inside Pelican Bay, the adult C'waam and Koptu need access to sufficient habitat to avoiding overcrowding and the sorts of stressful conditions that can exacerbate the spread of disease and parasites and contribute to fish mortality. [*Id.* at ¶ 34; ECF No. 13-3 at ¶ 98]. The 2013 BiOp relied on then-new bathymetry data indicating that the entrance to Pelican Bay was deeper than previously understood, which suggested that lower UKL elevations could still provide adequate access. (One of the assumptions underpinning the effects analysis of the 2013 BiOp was that this new data was accurate. [ECF No. 13-2 at §8.2].) Yet this data has proven to be flawed, [Exhibit A at ¶ 35], and even USFWS has recognized that "new science related to [UKL] bathymetry" needs to be evaluated as part of the reconsultation process. [ECF No. 44-1 at 4]. The Conservation Levels are based on what remains the best available science regarding UKL bathymetry, 1992 data that was conducted by taking physical measurements, with the reliability to ensure the necessary access and habitat. [Exhibit A at ¶ 35]

Ultimately, the confluence of factors immediately facing the C'waam and Koptu—especially aging and decreasing populations, extremely poor water quality this summer in UKL, and two decades of effectively no recruitment—demonstrate that the species are at imminent risk of an event that could reduce their numbers past the point where they can survive as viable, self-sustaining populations. It is this imminent and irreparable injury the Klamath Tribes seek to avoid through a preliminary injunction.

**IV.    Plaintiff Has Diligently Pursued Its Claims to Save the C'waam and Koptu.**

1    Federal Defendants' argument that the Klamath Tribes have not been diligent in advancing their

2 claims and seeking injunctive relief is factually inaccurate, unsupported by law and mischaracterizes the

3 Tribes' claims.  It should be summarily rejected. Federal Defendants' contention that the Klamath Tribes

4 have been squatting on their claims for the past five years is particularly puzzling. [ECF No. 44 at 13–

5 14]. They suggest that the Tribes could and should have filed suit "as early as June 2013, when Upper

6 Klamath Lake first fell below an end-of-month threshold," [*Id.*], which is not only inconsistent with the

7 claims actually presented in this case and invites a waste of judicial resources, but it is a slap in the face

8 to the significant time, effort and resources the Tribes have invested working with Federal Defendants

9 and other stakeholders, including several of the Defendant-Intervenors, to try to make the 2013 BiOp

10 succeed.  Indeed, the Tribes have diligently engaged Federal Defendants concerning the Project before

11 and after the inception of the 2013 BiOp. [*See*, *e.g.*, ECF 13-2 at § 8.1.2 (Tribes' input into development

12 of Klamath Basin Project Model); §§7.10.1.2 & 7.10.1.3 (Tribes' collection of water quality data sets);

13 and § 13.7(3) (supporting Tribes' effort to better understand UKL food web through plankton studies);

14 ECF No. 39 at ¶¶ 31–32 (Kirby Declaration) (Tribes led the Hydrology Team responsible for developing

15 the hydrologic model "which informed and served as the basis of the 2012 BA and the 2013 BiOp"); *id.*

16 at ¶ 52 (Tribes' leadership role in correcting erroneous threshold calculation formula); Exhibit A at ¶46].

17 Concomitantly, the Tribes sought to avoid costly and divisive litigation by participating vigorously in a

18 Klamath Basin-wide settlement effort that was designed, in part, to restore the ESA listed fisheries as

19 part of a comprehensive solution to a host of challenges facing the Basin.  Unfortunately, due to

20 Congressional inaction, the Klamath Basin Restoration Agreement ("KBRA") terminated on December

21 31, 2015.[2]  And it was only on December 28, 2017, that the Upper Klamath Basin Comprehensive

22 Agreement, a companion agreement to the KBRA that focused on habitat restoration above UKL,

23

24

_____

[2]Defendant-Intervenors have filed a copy of the KBRA as ECF No. 60–2.

COMBINED REPLY TO OPPOSITION TO MOTION FOR
PRELIMINARY INJUNCTION                                8                    3:18-CV-03078

terminated after nearly two years of review by the Secretary of the Interior. The Tribes were deeply vested in pursuing alternative, cooperative pathways to protect the ESA-listed and treaty-protected species, not sitting on their rights.

During this same period, though, the Klamath Tribes observed with mounting concern the ongoing changes in the hydrology of the Klamath Basin and Reclamation's continued failure to ensure that UKL elevations routinely stayed well above the thresholds as the 2013 BiOp had contemplated [*see* ECF 13-2 at § 13.3.2, T&C1c], even after the Tribes worked in good faith to improve the threshold calculation formula. [*See* ECF No. 44-12 at 1; ECF No. 39 at ¶ 52].  But rather than rushing to the courthouse, the Tribes first tried to engage constructively with Reclamation.  This engagement has taken the form of consistent participation in various technical working groups and advisory groups, including regular Klamath River Flow Account Scheduling Technical Advisory (FASTA) meetings, as well as specifically addressing Reclamation's consistent pattern throughout BiOp implementation from 2013 through today in correspondence, meetings and telephone calls.  [Exhibit A at §§ 51–54; ECF No. 33 at Exhibit G at ¶¶ 8–12; Correspondence from the Klamath Tribes to Reclamation, dated May 26, 2017 and February 14, 2017, attached hereto as **Exhibit B**]. The Tribes have been consistently engaged with Federal Defendants about the impacts UKL elevations have on the C'waam and Koptu and their critical habitat throughout the species' life stages. That the Federal Defendants now suggest the Tribes instead should have shut up and sued illustrates the stark difference between their and the Tribes' theories of ESA compliance: grudging management to (or below) thresholds on one hand and managing UKL levels according to the best available science to stop the sharp decline of endangered populations on the other.

In any event, matters were made even more acute by the first significant die-off of adult C'waam and Koptu in many years in 2017.  [Exhibit A at ¶ 26].  In late December, 2017, the Klamath Tribes met with Alan Mikkelsen, Senior Advisor to the Secretary of Interior for Water and Western Resource Issues, to discuss a sucker "triage" plan, which included several measures aimed at trying to halt the

1    C'waam and Koptu's slide toward extinction. [*Id.* at ¶ 53]. The Tribes met with Mr. Mikkelsen again on

2    February 7, 2018 [*id.*], but unsatisfied that sufficiently protective measures would be put in place,

3    particularly in light of the lack of precipitation and continued dire forecasts for the 2018 water year, they

4    filed their 60-day notice on February 9, 2018, [ECF No. 1-1]. Even then, however, the Tribes' did not

5    completely give up on their efforts to reach an accommodation with the United States and the Tribes'

6    neighbors in the Basin.  On March 15, 2018, the Tribes met again with Reclamation and USFWS to

7    discuss the possible resolution of the claims the Tribes identified in the 60-day notice, including through

8    adoption of the Conservation Levels. [Exhibit A at ¶ 53].  Discussions continued through the spring [*id.*

9    at ¶¶ 52–53], as Reclamation delayed issuing the 2018 Operations Plan that would explain its strategy

10   for allocating water among ESA needs and Project uses.  Reclamation did not issue the Plan until mid-

11   June, nearly a month after the Tribes' filed the instant action. [*See id.* at ¶ 55; and ECF 40-2 (2018

12   Klamath Project Annual Operations Plan)] In light of this background, Federal Defendants' assertion

13   that a "month" between the end of the 60-Day Notice period in April, 2018 and the filing of Plaintiff's

14   Complaint and Motion for Preliminary Injunction in May, 2018 constitutes "a years-long delay" defies

15   logic and contradicts Congress' intent for the 60-Day Notice. *See Hallstrom v. Tillamook Cnty.*, 493

16   U.S. 20, 29 (ESA notice requirement "allows government agencies to take responsibility for enforcing

17   environmental regulations, thus obviating the need for citizen suits" and "gives the alleged violator an

18   opportunity to bring itself into complete compliance with the Act and thus likewise render unnecessary a

19   citizen suit." (internal quotation marks and citations omitted)).

20          The analysis of the Klamath Tribes' diligence in pursuing their claims must turn specifically on

21   the facts of this case, not on an abstract comparison of dates as the Federal Defendants offer to this

22   Court.  There certainly is no credible comparison between the Tribes' actions here and the delay at issue

23   in Federal Defendants' proffered authority.  After reciting the commonplace principle that "[a] party

24   seeking a preliminary injunction must generally show reasonable diligence[,]" *Benisek v. Lamone*, 138

COMBINED REPLY TO OPPOSITION TO MOTION FOR          10          3:18-CV-03078
PRELIMINARY INJUNCTION

S.Ct. 1942, 1944 (2018), the United States Supreme Court went on to deny relief in an election map challenge where "appellants did not move for a preliminary injunction in the District Court until six years, and three general elections, after the 2011 map was adopted, and *over three years after the plaintiffs' first complaint was filed*." *Id.* (emphasis added).

*Defs. of Conewango Creek v. Echo Developers, LLC*, 06-242E 2007 WL 3023927 (W.D. Penn. Oct. 12, 2007), is no more apposite.  There, the plaintiff waited for over a year after construction began on a new shopping mall commenced to sue over alleged permitting process errors, and then proceeded to ignore a series of court-ordered deadlines before seeking to advance its case in earnest.  *Id.* at *14.  It was on this record that the district court found that "[t]he delay occasioned by Plaintiff in first bringing and then pursuing its claim was inordinate."  *Id.*  The contrast between the dilatory actions displayed by the *Conewango* plaintiff and the Klamath Tribes' longstanding effort to use every tool at their disposal to protect and preserve the C'waam and Koptu, and to move expeditiously to advance its case and request for preliminary injunctive relief when no other option was left could not be more stark.

Finally, in *Sierra Club v. United States Army Corps of Eng'rs*, No. Civ.A. 05–1724JAP, 2005 WL 2090028 (D. NJ Aug. 29, 2005), the district court found that plaintiffs could not make out any of the factors necessary for preliminary injunctive relief.  *Id.* at *6 (no likelihood of success on the merits); *18 (no irreparable harm); *19 (balance of equities weighs against injunctive relief); and *21 (public interest does not weigh in favor of injunctive relief).  Against the backdrop, the court merely noted that plaintiff's delay of nearly two months between filing its complaint and moving for preliminary injunctive relief cut against its claim of exigency. *Id.* at *18. Here, by contrast, the Tribes moved for a preliminary injunction motion immediately upon filing suit and made both filings before Reclamation issued its 2018 Annual Operations Plan.

**V.     Venue is Proper in this District.**

1    The Federal Defendants incorporate their arguments for dismissal of the Klamath Tribes' claims

2    on the basis of venue as set forth in their Motion to Dismiss. [ECF No. 44 at 14 (citing ECF No. 18)]. In

3    reply, the Klamath Tribes incorporate their prior arguments against dismissal as set forth in their

4    Opposition to the Federal Defendants' Motion to Dismiss. [ECF No. 33].

5    **VI.    The Klamath Tribes are Likely to Prevail on the Merits of Count I.**

6    Federal Defendants and Defendant-Intervenors assert that the Klamath Tribes are unlikely to

7    prevail on the merits of Count I alleging that Reclamation has committed unlawful take in its operation

8    of the Project. Specifically, they assert that Reclamation has not violated the conditions of the ITS the

9    USFWS issued in conjunction with the 2013 BiOp, and that any take that has or will occur is therefore

10   protected by the ITS. Federal Defendants also assert that Reclamation has not exceeded the triggers

11   included in the ITS and that Reclamation's repeated breaches of the 2013 BiOp's thresholds do not fall

12   outside the conditions modeled in the 2013 BiOp's effects analysis, further insulating Reclamation from

13   take liability. They are mistaken.

14   One of the 2013 BiOp's critical assumptions was that "[t]he [periods of record] for the hydrology

15   of the three primary Project reservoirs represent the range and distribution of elevations that are

16   reasonably likely to occur over the 10-year consultation term (May 31,2013–March 2023)." [ECF No.

17   13-2 at § 8.2].  This assumption was built into Term and Condition 1c of the 2013 BiOp's ITS.  [*Id.* at §

18   13.3.2, T&C 1c].  Yet the hydrologic conditions that have occurred during the term of the BiOp to date

19   have been outside the scope of the conditions modeled as part of the 2013 BiOp's effects analysis, a fact

20   that—as noted by the Court in the *Yurok* and *Hoopa Valley* cases—Reclamation itself has recognized.

21   *Yurok Tribe*, 321 F. Supp. 3d at 474 ("In July, 2015, the Bureau sent a letter to NMFS noting that

22   'unprecedented, multi-year drought conditions have persisted which have caused variations in operations

23   and hydrologic conditions that were not anticipated at the time the Proposed Action was analyzed in the

24   BiOp'"). *See also* [ECF No. 44-16 at 1 (Laurie Sada (USFWS) e-mail to Brian Person (Reclamation))

COMBINED REPLY TO OPPOSITION TO MOTION FOR                    12              3:18-CV-03078
PRELIMINARY INJUNCTION

("I suspect that we may be witnessing a situation that was not demonstrated in the POR that may explain why we are where we are.")].   The net effect of these conditions has been to force the critically endangered C'waam and Koptu to endure lower elevations in UKL more often than was contemplated in the 2013 BiOp's effects analysis, exposing them to more adverse habitat and water quality conditions. [*See* Exhibit A at ¶¶ 3–15]

During the 38 months of the irrigation season that have transpired since the issuance of the 2013 BiOp, Reclamation has dropped below the thresholds 11 times, and has been right at or just barely above the thresholds an additional six times (including in both April and May of this year) [*see* ECF No. 44-11 at ¶ 6], meaning that the C'waam and Koptu have been exposed to poorer conditions than the 2013 BiOp contemplated over 49% of the time when species and Project needs are potentially in conflict.[3]   Nor does this figure represent the upper bound of the number of times the species have suffered from excessively adverse conditions since the thresholds, as created by USFWS, were "based on hydrologic conditions, with the expectation that suckers would experience lake levels commensurate with the hydrology observed in any given year." [ECF No. 44-1 at 4 (USFWS Technical Report)].   USFWS further explains that "[t]he Service determined that these thresholds encompassed the biologically important elevations that suckers need to fulfill their life history needs, while allowing for intra- and inter-annual hydrologic variability that suckers would have experienced in the past." [*Id.*]   Where the range of hydrologic conditions has proven to be consistently poorer than the C'waam and Koptu "would have experienced in the past[,]" the determination that the thresholds are adequate to allow them "to fulfill their life history

---

[3] In an effort to dismiss the significance of Reclamation's failure to manage above the thresholds, Federal Defendants claim that the 2013 BiOp contemplated the possibility of exceptions to Reclamation's meeting of the thresholds.  [ECF No. 44 at 19–20 (citing to page 117 of the 2013 BiOp)]. Federal Defendants neglect to note, however, that the very portion of the 2013 BiOp they invoke goes on to state that these exceptions are only contemplated to occur during the winter months.  [ECF No. 13-2 at § 8.1.3 (page 135) ("Elevations in UKL will be greater than the thresholds for *all* hydrologic conditions observed during the POR, except for discrete situations caused by rare winter events.") (emphasis added)].

needs" is vitiated, a situation exacerbated by the fact that—as discussed at length in the Tribe's Motion for Preliminary Injunction [*see* ECF 13 at 18-22]—Reclamation has consistently managed the elevation of UKL to meet rather than stay "well above" the thresholds. [ECF No. 13-2 at § 13.3.2, T&C 1c]. This is not a flaw with the 2013 BiOp as it was promulgated, and the Klamath Tribes do not attack it on that basis.  Rather, it is a reflection of the fact that the assumptions on which the 2013 BiOp was predicated have not been borne out in practice, to the detriment of the species.  Consequently, the ITS has been triggered on a qualitative basis. While this fact may not automatically invalidate the ITS for purposes of exposing Federal Defendants to immediate liability for any take they commit, it certainly demonstrates that the 2013 BiOp cannot remain the status quo.  *See Yurok Tribe*, 231 F.Supp. 3d at 479.  Yet this is precisely what Reclamation has purported to do in its 2018 Operations Plan.  [*See* ECF No. 40-2].  This is an arbitrary and capricious decision.  As such, there is an imminent risk of a violation of Section 9 of the ESA, and the Klamath Tribes are likely to succeed on the merits of this claim.

In light of the foregoing, Federal Defendants' and Defendant-Intervenors' arguments that the Klamath Tribes' Section 9 Take claim will not succeed because Reclamation has not exceeded the numeric thresholds of the ITS are beside the point.  Moreover, Reclamation has not properly accounted for the entire extent of its take.  Federal Defendants point to Reclamation's 2013-2017 Incidental Take Reports to show that Reclamation has not exceeded the numeric take levels set forth in the ITS.  [ECF No. 44 at 15-18 (citing ECF No. 44-6 to 44-10 (Incidental Take Reports for 2013, 2014, 2015, 2016 and 2017))].  While the Reports reflect that, based on the proxy measure selected by the 2013 BiOp (measured flows), the ITS take levels were not exceeded due to entrainment at the Link River Dam or A Canal, they also arbitrarily assert that no juveniles or adults were harmed or harassed by virtue of "Seasonal Habitat Reductions Owing to Water Diversions and End-of-Season Flow Reductions."  [ECF No. 44 at 16-17].  This conclusion is not tenable.

COMBINED REPLY TO OPPOSITION TO MOTION FOR
PRELIMINARY INJUNCTION

14

3:18-CV-03078

1    The 2013 BiOp recognized that "where there are substantial decreases in the amount or quality

2  of habitat, adverse effects" to juveniles and adults caused by lower August and September water levels

3  "would likely be greater and could be severe enough to cause injury."  [ECF No. 13-2 at § 13.2.1.6)].

4  The 2013 BiOp further explained that "at very low lake levels suckers confined to small areas of shallow

5  water would likely be at an increased risk from poor water quality, predation, parasitism, and disease,

6  and increased competition for food could reduce food availability, thus potentially lowering productivity

7  and survival."  [*Id.*; *see also* [ECF No. 13-3 at ¶¶ 85-86 (Buettner Declaration)].   The 2013 BiOp set

8  incidental take levels at 50,000 juveniles and adults harassed each year and 5,000 juveniles harmed by

9  these poorer conditions.   [ECF No. 13-2 at § 13.2.1.6)]. Despite the 2013 BiOp's incidental take

10  analysis, Federal Defendants explain that they assume that there was *zero* take of juveniles and adults

11  due to these conditions "because [Reclamation] operated the Project consistent with the effects analysis

12  in the Biological Opinion."  [ECF No. 44 at 25 n.6 (internal quotation marks omitted)].   Reclamation

13  deployed a similar rationale and essentially the identical language to justify a zero take conclusion for

14  2014-2017.   *See*  [ECF No. 44-8 at 11 (2014 Incidental Take Report); ECF No. 44-7 at 10 (2015

15  Incidental Take Report); ECF No. 44-9 at 7 (2016 Incidental Take Report); and ECF No. 44-10 at 7

16  (2017 Incidental Take Report)]. Yet neither the Reports nor the 2013 BiOp provide any basis to support

17  that conclusion that Reclamation's operations led to *no* take whatsoever.  Given the poor water quality

18  that UKL has consistently endured during the August/September period, and the important role lake

19  levels have on allowing juvenile and adult C'waam and Koptu to access and shelter safely in important

20  water quality refuges such as Pelican Bay and Fish Banks [ECF 13-3 at ¶¶ 95-99); Exhibit A at ¶¶ 31–

21  37], the lower lake levels the species have had to endure under Reclamation's operation of the Project

22  since the issuance of the 2013 BiOp have inevitably caused harm and harassment.  This was particularly

23  so in 2017, when UKL witnessed a significant die-off, particularly of C'waam. [*See* Exhibit A at ¶¶ 16–

24  19, 26].

1    The Klamath Tribes agree that quantifying actual numbers of take under these circumstances is a

2    challenging proposition.  But Reclamation's apparent policy (as evidenced by the 2013-2017 Incidental

3    Take Reports) of using releases from UKL as its proxy measure for assessing take due to seasonal

4    habitat reduction, and routinely deciding that so long as cumulative releases do not drop below the

5    lowest conditions modeled in the BiOp then no take due to seasonal habitat reductions has occurred is

6    irrational, as the proxy measure bears no relationship to the condition ostensibly being monitored. *Cf.*

7    *Oregon Natural Desert Ass'n. v. Tidwell*, 716 F.Supp.2d 982, 999 (D. Or. 2010). This arbitrary decision

8    is exacerbated by the fact that an assumption of zero take under these circumstances is completely

9    incompatible with the "institutionalized caution mandate" of the ESA.  *See Washington Toxics Coalition*

10   *v. EPA*, 413 F.3d 1024, 1031 (9th Cir. 2005).  This, too, is not a failing of the 2013 BiOp, which set

11   incidental take levels at 50,000 juveniles and adults harasses and 5,000 juveniles harmed by seasonal

12   habitat reductions in light of the fact that "[i]n any one year there are likely to be several million age-0

13   juvenile suckers present in UKL, so the estimate of the numbers of juveniles harmed is likely to be a

14   small percentage of the total present."  [ECF No. 13-2 at § 13.2.1.6 (internal citation omitted)].  Rather,

15   it is a further demonstration of the flaws in Reclamation's management of the Project since the issuance

16   of the 2013 BiOp. With potentially several million juveniles in UKL each year, and Reclamation

17   accounting for the harm occurring to them via entrainment as happening to between 630 and 1,079

18   individual juveniles each year, *see* [ECF No. 44 at 15–18], the fact that there has still been no evidence

19   of successful recruitment into the adult population during the term of the 2013 BiOp indicates that it is

20   likely that the number of juveniles being harmed by seasonal habitat reductions exceeds the 5,000

21   authorized by the ITS.  [Exhibit A at ¶¶ 16–19]. And it is certainly a more rational and less arbitrary

22   conclusion than the one reached by Reclamation that no such take is occurring at all. The Klamath

23   Tribes are likely to succeed on the merits of this claim.

24   **VII.    The Klamath Tribes are Likely to Prevail on the Merits of Count II.**

COMBINED REPLY TO OPPOSITION TO MOTION FOR          16          3:18-CV-03078
PRELIMINARY INJUNCTION

Federal Defendants and Intervenor-Defendants both argue that the Klamath Tribes' Count II is not likely to succeed on the merits. [*See* ECF No. 44 at 24–27; ECF No. 38 at 28–35]. Because each raises unique points, the Klamath Tribes will reply to Federal Defendants' and Intervenor-Defendants' arguments separately.

A. *Federal Defendants Fail to Raise any Meaningful Argument in Support of Their Position that The Klamath Tribes are Not Likely to Prevail on Count II.*

Federal Defendants point out that the Klamath Tribes' Count II jeopardy and adverse modification claim shares a factual predicate with their Count I takings claim—Reclamation's repeated failure to maintain the elevation of UKL in accordance with the 2013 BiOp. [ECF No. 44 at 25]. The Federal Defendants do not, challenge this fact however.  Instead, they attempt to minimize its legal significance.  But their arguments miss the mark.

Federal Defendants note that the Klamath Tribes have not claimed that USFWS and NMFS "issued a defective BiOp," but instead "challenge Reclamation's operation of the Klamath Project in relation to the end-of-month [UKL] elevations analyzed in FWS' BiOp." [ECF No. 44 at 25]. The effect of this, according to Federal Defendants, is that the 2013 BiOp "is 'entitled to a presumption of regularity.'" [ECF No. 44 at 25 (quoting *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 601 (9th Cir. 2014))]. But the quoted language from *San Luis & Delta-Mendota Water Authority* simply recites the deferential standard of review federal agencies enjoy when the validity of a biological opinion itself is challenged. *See* 747 F.3d 581, 599–601 (9th Cir. 2014). This language is simply not relevant to Count II of the complaint, where the Tribes do not challenge the 2013 BiOp *ab initio*, but rather challenge Reclamation's operation of the Project subsequent to the issuance of the 2013 BiOp and the BiOp's ongoing viability in light of unanticipated circumstances. As Federal Defendants acknowledge "the only question [is] Reclamation's conformance with ESA Section 7(a)(2)." [ECF No. 44 at 25].

Federal Defendants observe that "the 2013 BiOp does not state that falling below the thresholds automatically jeopardizes suckers or destroys or adversely modifies the species' critical habitat." [ECF No. 44 at 25]. This may be so, but what matters for purposes of the Klamath Tribes' Count II is whether, in fact, Reclamation's operation of the Project jeopardizes the ongoing existence of the C'waam and Koptu and/or destroys and adversely modifies their critical habitat. *See* 16 U.S.C. § 1536(a)(2). "[A]n action agency may not escape its responsibility under the ESA by simply rubber stamping the consulting agency's analysis." *Aluminum Co. of Am. v. Adm'r, Bonneville Power Admin.*, 175 F.3d 1156, 1161 (9th Cir. 1999); *accord Resources Ltd., Inc. v. Robertson*, 35 F.3d 1300, 1304 (9th Cir.1994); *Pyramid Lake Paiute Tribe of Indians v. U.S. Dep't of Navy*, 898 F.2d 1410, 1415 (9th Cir. 1990) ("A federal agency cannot abrogate its responsibility to ensure that its actions will not jeopardize a listed species...."). Regardless of the issuance of the 2013 BiOp or the consulting agencies' subsequent agreement with Reclamation that repeated threshold violations and drought do not put Reclamation's operation of the Project outside the scope of the effects analyzed by the 2013 BiOp, Reclamation remains responsible for insuring its actions do not jeopardize the continued survival of the C'waam and Koptu or destroy or adversely modify critical habitat. *See Stop H-3 Ass'n v. Dole*, 740 F.2d 1442, 1460 (9th Cir. 1984) ("The appellants are correct when they argue that [federal action agency] cannot abrogate its responsibility to decide whether it has taken all possible action to insure that [agency action] is not likely to jeopardize the continued existence of the Creeper [endangered species]."). Though the consultation leading to the 2013 BiOp and Reclamation's subsequent colloquies with USFWS regarding threshold violations may be sufficient to satisfy Reclamation's "*procedural* obligations under the ESA, [Reclamation] may not rely solely on a . . . biological opinion to establish conclusively its compliance with its *substantive* obligations under section7(a)(2)." *See Pyramid Lake Paiute Tribe of Indians*, 898 F.2d at 1415.

1    In light of consistently low UKL elevations and dryer-than-anticipated conditions, Reclamation's

2    failure to recognize the need to change its pattern of operations and implement more immediately

3    protective measures for the C'waam and Koptu is arbitrary, capricious, and contrary to law because it

4    jeopardizes the very survival of the C'waam and Kotpu and adversely modifies their critical habitat. As

5    explained more fully in the Klamath Tribes Motion for Preliminary Injunction, lower-than-anticipated

6    UKL elevations have directly and obviously resulted in the destruction and adverse modification of

7    habitat. [*See* ECF No. 13 at 25-27].  As late summer approaches again this year, significant habitat

8    losses from low UKL elevations will occur within water quality refuge areas.  [Exhibit A at ¶¶ 31–37].

9    If elevations are sufficiently low, many juvenile and adult C'waam and Koptu will be unable to even

10   access the Pelican Bay water quality refuge area. [*Id.* at ¶¶ 32–37].

11   Moreover, the 2013 BiOp itself explicitly cautions that it may not remain valid if UKL elevations

12   are consistently at or below the thresholds. [ECF No 13-2 at § 8.3.1.1 (page 135)]. It is because of this

13   risk that, as Federal Defendants explain, the 2013 BiOp "included a consultation/adaptive management

14   process" to be followed in the event of low UKL elevations. [ECF No. 44 at 25]. Federal Defendants

15   describe this process:

16       When [UKL] elevations approach a threshold, 'Reclamation must identify the reasons for
         the unexpected elevations and consult with the Services regarding implementation of
17       potential adaptive management actions to prevent violation of the threshold.'

18   [ECF No. 44 at 9 (quoting 2013 BiOp)]. After allowing UKL to fall below elevation thresholds in April

19   and May, 2017 (for the 11th and 12th times over the past five years) the Federal Defendants engaged in

20   such a "consultation/adaptive management process," producing a "Hydrologic and Biological

21   Assessment" that purported to analyze the causes and consequences of these failures. [ECF No. 44–17;

22   ECF No. 44–11 at ¶ 14]. Conveniently the Assessment absolves Reclamation of all blame for the

23   breaches, ascribing them instead to "flood control operations, over-forecasting of monthly UKL inflows

24   in May, and the assumption of perfect foresight in Project operations[,]" all of which were ostensibly

COMBINED REPLY TO OPPOSITION TO MOTION FOR                 19              3:18-CV-03078
PRELIMINARY INJUNCTION

1    "outside the scope of the Proposed Action and beyond the control of Reclamation." [ECF No. 44–17 at

2    9].  But as Federal Defendants have previously explained to this Court:

3         Link River Dam is operated and maintained by PacifiCorp, a utility company, pursuant to
          an agreement Reclamation. But, Reclamation retains discretion to specify Upper Klamath

4         Lake elevations and the release of water into the lower Klamath River.

5    [ECF No. 18 at 5 (internal citations omitted); *compare* ECF No. 44–11 at ¶ 14 (characterizing

6    PacifiCorp's release of water as "beyond the control of Reclamation")].    Moreover, the fact that

7    forecasting errors led Reclamation to breach the May 2017 threshold during the ninth wettest of the past

8    37 water years [ECF No. 44-17 at 4], further reflects Reclamation's continued privileging of Project

9    deliveries over ensuring that the needs of the C'waam and Koptu are met.

10        The Assessment also lacks any firm commitment to address Reclamation's persistent failure to

11   manage UKL above the thresholds or any specific preventative measures.   Instead, the Assessment

12   merely recommends "*continued* coordination" between Reclamation and the consulting agencies,

13   "*continu[ing]* to track actual UKL elevations as they relate to the remaining end-of-month thresholds

14   with a conservative approach to managing UKL elevations," and "coordinat[ing] with Klamath Basin

15   irrigators to *continue* conserving water . . . ." [ECF No. 44–17 at 10–11 (emphasis added)].

16   Meaningfully absent from these recommendations is any change to the Project management practices

17   that have resulted in a 20% threshold violation rate over the past five years. Also absent is any

18   acknowledgement of Reclamation's consistent failure to responsibly and competently manage UKL

19   elevations consistent with the assumptions that underpinned the 2013 BiOp. The May 2016 threshold

20   violation was also due to Reclamation's misreading of early spring hydrological clues—though

21   apparently this conclusion has never been vetted more formally than via an email promising to engage in

22   more substantive discussion at a later date. [ECF No. 44–16]. Thus while Reclamation may perhaps

23   have met its procedural obligations under the 2013 BiOp, its continued efforts to ignore the existence of,

24

COMBINED REPLY TO OPPOSITION TO MOTION FOR            20            3:18-CV-03078
PRELIMINARY INJUNCTION

1    let alone take responsibility for, the systematic failure to conservatively manage UKL thresholds is

2    arbitrary, capricious, and contrary to law and violate Section 7(a)(2). [4]

3         The discrepancy between what the 2013 BiOp forecast and how Reclamation has actually

4    operated the Project deprives Reclamation of the right to shelter under the 2013 BiOp itself.  Here, as in

5    *Yurok Tribe*, the 2013 BiOp's "core presumption" that certain, wetter, hydrological conditions would

6    obtain during the period from 2013 through 2023, resulting in higher UKL elevations (and downstream

7    flows) has proven false.  *See* 231 F. Supp. 3d at 477. As has the 2013 BiOp's presumption that

8    Reclamation's management of the Project would lead to end-of-month elevations consistently "well

9    above" the applicable thresholds. [*See* ECF No. 13-2 at § 13.3.2, T&C 1c (2013 BiOp & ITS)].  In light

10   of these facts, "it is unclear what analysis remains to support the BiOp's no-jeopardy conclusion," *Yurok*

11   *Tribe*, 231 F. Supp. 3d at 477, and Reclamation cannot shield its post-BiOp management decisions from

12   scrutiny under Section 7(a)(2) by invoking the protection of a BiOp that did not contemplate them.  *See*

13   *id.* at 479 ("Because the BiOp did not address these issues 'it cannot be determined whether the

14   proposed project will result in a violation of the ESA's substantive provisions' and cause

15   jeopardy….")(quoting *Thomas v. Peterson*, 753 F.2d 754, 763 (9th Cir. 1985).

16        Moreover, while Reclamation claims it has engaged in adequate consultation and adaptive

17   management with respect to each of the 12 conceded threshold violations, it has provided no record of

18   any consultation regarding the June 2013 threshold violation and the Klamath Tribes are aware of none.

19   [*See* ECF No. 44 at 19–22, 25; ECF No. 44–11; ECF No. 44–13]. And the consultation and "adaptive

20   management" in response to the May 2016 threshold violation was an email that failed to identify the

21

22   _____

     [4]Even if the Assessment was correct in concluding that the events that led to individual breaches of the thresholds
     were beyond Reclamation's control, that would not change Reclamation's obligation to satisfy Section 7(a)(2) by

23   managing the circumstances it can control,  As this Court recognized in a similar context, "[i]t is [Reclamation's]
     responsibility and obligation to ensure that its action do not jeopardize the Coho salmon, after taking factors

24   outside its control, such an environmental variability, into account.  16 U.S.C. § 1536(a)(2)." *Yurok Tribe*, 231
     F.Supp.3d at 483.  Reclamation has the same obligation to the C'waam and Koptu.

COMBINED REPLY TO OPPOSITION TO MOTION FOR              21              3:18-CV-03078
PRELIMINARY INJUNCTION

1    reason for the violation, other than to note that Reclamation's predictions had been inaccurate or

2    examine why hydrologically conditions consistently fail to match expectations and whether this repeated

3    failure to anticipate UKL elevations jeopardizes the C'waam and Koptu. [ECF No. 44–16].

4         Federal Defendants attempt to shift the focus by rehashing the argument this Court already

5    rejected in *Yurok Tribe* to the effect that, absent a finding that the 2013 BiOp is "arbitrary, capricious, or

6    otherwise unlawful, those documents retain full force and effect while reinitiated consultation proceeds

7    and ESA Section 7(d) becomes the applicable standard by which to judge the agency's conduct." [ECF

8    No. 44 at 26 (citing *Defs. of Wildlife v. Bureau of Ocean Energy Mgmt.*, 684 F.3d 1242, 1252 (11th Cir.

9    2012)]. As this Court has previously explained, *Defenders of Wildlife*, 684 F.3d 1242, and cases to

10   similar effect "seem to conflict with Ninth Circuit precedent which says that reinitiation of consultation

11   does need to result in a new Biological Opinion." *Yurok Tribe*, 231 F. Supp. 3d at 476–77 (citing *Envtl.

12   Prot. Info. Ctr. v. Simpson Timber Co.*, 255 F.3d 1073, 1078 (9th Cir. 2001) ("Reinitiation of

13   consultation requires either the FWS or the NMFS to issue a new Biological Opinion before the agency

14   action may continue."); *Mt. Graham Red Squirrel v. Madigan*, 954 F.2d 1441, 1451 (9th Cir. 1992)

15   ("Reinitiation of consultation requires the Fish and Wildlife Service to issue a new Biological Opinion

16   before a project may go forward.")). Indeed, "[a]lthough the federal defendants frame Section 7(d) as

17   permitting continued reliance on the 2013 BiOp, Section 7(d) does not offer an agency affirmative

18   support to continue a project's operations." *Yurok Tribe*, 231 F.Supp. 3d at 480. As with the plaintiffs in

19   *Yurok Tribe*, the Klamath Tribes have not brought a Section 7(d) claim, nor seek to prevent a new

20   federal activity from commencing. Rather, the gravamen of the Tribes' claim set forth in Count II is that

21   Reclamation needs to alter its ongoing operation of the Project to avoid ongoing jeopardy to the C'waam

22   and the Koptu. Federal Defendant's invocation of Section 7(d) is therefore wholly inapposite. *See Id.*

23   ("Since plaintiffs seek to modify the current operations of an ongoing project, not halt a planned project,

24   Section 7(d) does not readily apply").

COMBINED REPLY TO OPPOSITION TO MOTION FOR          22          3:18-CV-03078
PRELIMINARY INJUNCTION

B.  *Defendant-Intervenors Likewise Fail to Establish that The Klamath Tribes are Not Likely to Prevail on Count II.*

Apart from the Federal Defendants, Defendant-Intervenors raise several distinct arguments regarding the likelihood of the Klamath Tribes to prevail on Count II. [ECF No. 38 at 28–35]. These arguments are likewise unpersuasive. First, Defendant-Intervenors argue the Klamath Tribes' Count II concerns wholly past violations and, is thus, not actionable under 16 U.S.C. § 1540(g)(1)(A). [ECF No. 38 at 28]. This is a mischaracterization. The Klamath Tribes have alleged that Reclamation, through past conduct, has jeopardized the continued existence of the C'waam and Koptu and adversely modified their critical habitat. But the Klamath Tribes also allege that due to the effects of persistently low UKL elevations since 2013, failure to adhere to the assumptions contained in the 2013 BiOp regarding operating well above the thresholds,[5] and a failure to otherwise implement protective UKL elevations will result in Reclamation continuing to jeopardize the continued existence and adverse modification of the critical habitat of the C'waam and Koptu. Thus, Count II is prospective, and, as such, cognizable under 16 U.S.C. § 1540(g)(1)(A). *See Sierra Club v. Yeutter,* 926 F.2d 429, 439–40 (5th Cir. 1991) ("Clearly, the district court has the authority to enjoin an agency from violating section 7 of the ESA. 16 U.S.C. § 1540(g)(1)(A). As part of that authority, the court may enjoin the agency from continuing activity that has resulted in past violations . . . .").

Second, Defendant-Intervenors argue that "Mr. Buettner's Declaration makes clear that the goal of the requested injunction is to 'mitigate' impacts not caused by the Klamath Project," which, they argue, goes beyond Reclamation's duty under Section 7(a)(2). [ECF No. 38 at 28]. The cited portion of

---

[5] Defendant-Intervenors are technically correct when they assert that the thresholds are not binding on Reclamation. [ECF No. 38 at 24–25].  As discussed above, Reclamation's paramount obligation in this context is to obey the strictures of Section 7(a)(2), and compliance with a BiOp can be a tool toward that end but is not the end itself.  But Defendant-Intervenors ignore the fact that Reclamation's failure to manage the Project consistent with the 2013 BiOp's assumptions about meeting the thresholds means that Reclamation has been conducting the action that was evaluated in the 2013 BiOp in a manner different than the that BiOp analyzed.  Therefore, Reclamation is not entitled to rely on the 2013 BiOp and its ITS to demonstrate compliance with the ESA.

COMBINED REPLY TO OPPOSITION TO MOTION FOR
PRELIMINARY INJUNCTION
23
3:18-CV-03078

Mr. Buettner's Declaration, however, references "[m]ajor changes to the UKL system in the last 150 years" that have resulted in too-low UKL elevations and poor water quality. [ECF No. 13–3 at ¶ 167]. While these changes are due in part, presumably, to upstream agricultural activity not technically a part of the Project, the "major changes" Mr. Buettner references primarily concern Reclamation's modification of UKL hydrology and diversion of water for irrigation purposes—the core purpose of the Project. [*See* ECF No. 13–3 at ¶¶ 11, 13–14]. Furthermore, as Defendant-Intervenors acknowledge, the Klamath Tribes seek an injunction mandating certain protective UKL elevations to preserve critical habitat within UKL and to avoid further jeopardy to the C'waam and Koptu. [*E.g.*, ECF No. 38 at 1]. Reclamation has a duty to "insure" its management of UKL "is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat . . . determined . . . to be critical." 16 U.S.C. § 1536(a)(2). This is true irrespective of whether each and every instance of harm to the species is directly attributable to the Project. *See*, *e.g*, *Yurok Tribe*, 231 F. Supp. 3d at 483. Thus, the Klamath Tribes' Count II states a claim arising squarely from Reclamation's duty under Section 7(a)(2) to avoid causing jeopardy or adversely modifying critical habitat.

Third, Defendant-Intervenors take issue with the Klamath Tribes' failure to frame their discussions "under the applicable arbitrary and capricious standard of review." [ECF No. 38 at 29]. To assuage the Defendants-Intervenors, the Tribes clarify that Reclamation's ongoing failure to ensure Project operations do not jeopardize the continued existence of C'waam and Koptu and/or adversely modify their critical habitat is an arbitrary and capricious dereliction of its duty under Section 7(a)(2) and contrary to law. *See, e.g.*, *Sierra Club v. Yeutter*, 926 F.2d at 439 ("The district court correctly employed the arbitrary and capricious standard in considering the section 7 claim.").

Fourth, Defendant-Intervenors implausibly assert that "the Plaintiff's arguments relate only to hydrology, not a causal linkage of UKL elevation to creating a 'jeopardy' condition." [ECF No. 38 at

29]. As the Klamath Tribes have illustrated at length, the hydrology of UKL directly determines the amount and quality of critical habitat in and around UKL and thus is intimately linked with the continued survival of C'waam and Koptu. [*See* ECF No. 13–3 at ¶¶ 60–166 (describing relationship between UKL elevations, quality and quantity of critical habitat, and C'waam and Koptu life functions)]. Construing Defendant-Intervenors' argument as the narrower claim that there is no causal relationship between Reclamation's failure to observe the thresholds and the status of the C'waam and Koptu is no more convincing. [ECF No. 37 at 29–31]. The 2013 BiOp recognized just such a relationship when it based its no-jeopardy conclusion in part on the fact that the proposed action it evaluated was intended to "include[] higher seasonal UKL elevations and greater certainty that elevation goals would be met compared to previous proposed actions." [ECF No. 13-2 at §§ 10.6 & 10.7]. As part of the analysis undergirding that conclusion, the 2013 BiOp made a series of assumptions about hydrologic conditions and lake levels, as represented most particularly by the thresholds, but also by the identification of separate lake levels beneath which the C'waam and Koptu would suffer adverse effects.[6] Thus, under the 2013 BiOp's own reasoning, Reclamation's failure to maintain UKL elevations above the thresholds does have a direct and significant "casual linkage" to the status of C'waam and Koptu and their critical habitat. [*See also* ECF No. 13-2 at §§ 8.3.1.1-8.3.1.5]. Repeated breach of the thresholds directly impairs the validity of the BiOp's analysis precisely because maintenance of the thresholds, and thus a low probability of UKL falling below the critical elevations identified in §§8.3.1.1–8.3.1.5, was a key assumption supporting the no-jeopardy and no adverse modification findings. Failure to maintain UKL elevations at or above those assumed by the BiOp thus results in unanticipated deprivations of habitat and harmful impacts to C'waam and Koptu. [*See* ECF No. 38 at 30

---

[6] It is these adverse effects levels that, for convenience's sake, the Klamath Tribes dubbed "USFWS Critical Elevations" in the opening brief. [*See* ECF 13 at 20-21]. Contrary to Defendant-Intervenors' aspersions, the Tribes did not "invent" them. [*See* ECF No. 38 at 23].

COMBINED REPLY TO OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION                    25                    3:18-CV-03078

1   (contending the Klamath Tribes have not identified an adverse "effect" of Reclamation's failure to

2   observe thresholds)].

3        The Klamath Tribes also reject the Defendants-Intervenors' contention that "Plaintiff's true

4   attack is on the 2013 BiOp." [ECF No. 38 at 29]. The Tribes reiterate: while the 2013 BiOp is a central

5   part of this case as it provides the framework against which Reclamation's subsequent management

6   decisions must be measured, the claims themselves do not challenge the 2013 BiOp itself.

7   **VIII.   The Klamath Tribes Are Likely to Prevail on the Merits of Count III.**

8        The Federal Defendants also contend that the Klamath Tribes are not likely to prevail on the

9   merits of their Count III—Failure to Reinitiate Adequate Consultation. [ECF No. 44 at 27–41]. The

10  Federal Defendants make three principal arguments to advance this position: first, that Count III is

11  "Jurisdictionally Moot and Not Justiciable"; second, that "Count III is Jurisdictionally and Prudentially

12  Unripe"; and, third, that Count III fails to allege that each of the Federal Defendants have violated a

13  discrete, mandatory legal duty. [*Id.*].  These arguments largely coincide with the Federal Defendants'

14  prior arguments for the dismissal of Count III [*See* ECF No. 18 at 19–24] and, accordingly, the Klamath

15  Tribes hereby incorporate that portion of their Opposition to the Federal Defendants' Motion to Dismiss

16  that is relevant here. [ECF No. 33 at 24–30].

17       A.  *Count III is Not "Jurisdictionally Moot."*

18       In labeling Count III "jurisdictionally moot," the Federal Defendants suggest Count III should be

19  dismissed because the Federal Defendants have already reinitiated consultation regarding the Project.

20  [ECF No. 44 at 28]. From this fact, the Federal Defendants mistakenly infer "that the factual predicate

21  for Count III has already occurred, and that the relief on the claim already has been provided." [*Id.*]

22       This Court, however, rejected the same argument in *Hoopa Valley Tribe*, distinguishing

23  authorities the Federal Defendants presently rely on, *Native Fish Soc. v. Nat'l Marine Fisheries Servs.*,

24  992 F. Supp. 2d 1095, 1116 (D. Or. 2014) and *Defenders of Wildlife v. Martin*, 454 F.Supp.2d 1085,

1   1103 (E.D. Wash. 2006), because the Yurok Tribe and the Hoopa Valley Tribe sought, in addition to

2   reinitation of consultation, a protective injunction pending completion of consultation, and thus found it

3   could "still grant plaintiffs effective relief on their reinitiation claim." *Yurok Tribe v. Nat'l Marine*

4   *Fisheries Serv.*, 230 F. Supp. 3d at 1131–32). The same is true here where, in addition to an order

5   requiring the Federal Defendants to consult specifically with respect to Project impacts to the C'waam

6   and Koptu, the Klamath Tribes seek a preliminary injunction to remain in place until consultation

7   produces a new biological opinion.

8           The Federal Defendants attempt to distinguish the present circumstances from those in *Hoopa*

9   *Valley Tribe* on the grounds that, there, their two-year delay in reinitiating consultation "caused take

10  exceedances." [ECF No. 44 at 29]. This argument is plainly contrary to the citizens' suit provision of

11  ESA, which as the Federal Defendants explain, "provides a cause of action for ongoing and imminent

12  future violations . . . " [ECF No. 44 at 7 (quoting *Hoopa Valley Tribe*, 230 F. Supp. 3d at 1120)], as well

13  as the purpose of the ESA to conserve listed species. *See generally* 16 U.S.C. § 1531. Moreover, it

14  ignores that the Klamath Tribes' reasons for seeking a preliminary injunction pending completion of a

15  new biological opinion are remarkably similar to those recited by this Court in granting similar relief to

16  the Hoopa Valley Tribe and the Yurok Tribe:

17          Plaintiffs note that in this case, and in their motion for partial summary judgment, they
            have requested that the court order the federal defendants to reinitiate formal consultation
18          and have requested an injunction in the form of specific protective flows to be put in
            place while the agencies complete the consultation process. Yurok Reply at 4 (Dkt. No.
19          54). They assert that the agencies are currently operating without a valid BiOp and that it
            will take the federal defendants at least six months to complete consultation and issue a
20          new no-jeopardy finding. *Id.* Because it will take the agencies some time to complete
            their consultation process, and the flows for the 2017 season will be locked in April, they
21          contend that an injunction is necessary. *Id.*

22  230 F. Supp. 3d at 1132. The Klamath Tribes also seek an injunction to protect listed species impacted

23  by the Project because "the agencies are currently operating without a valid BiOp" and "it will take the

24  agencies some time to complete their consultation process." Like the SONCC coho salmon, the C'waam

COMBINED REPLY TO OPPOSITION TO MOTION FOR                27              3:18-CV-03078
PRELIMINARY INJUNCTION

1    and Koptu are presently without the benefit of a valid no-jeopardy biological opinion and likely will be

2    for some time. Accordingly, protective measures should remain in place until a new biological opinion

3    fully addressing Project impacts to the C'waam and Koptu in light of unanticipated hydrological

4    conditions is complete. *See Hoopa Valley Tribe*, 230 F. Supp. 3d at 1134–35.

5         Nonetheless, the Federal Defendants argue that Count III is moot because injunctive relief

6    "should not be available on a 'failure to reinitiate' claim where reinitiated consultation is ongoing in the

7    context of a valid BiOp and ITS." [ECF No. 44 at 30–32]. This argument, of course, ignores that the

8    2013 BiOp and ITS are no longer valid, as discussed above. Thus, contrary to the Federal Defendants'

9    characterization, there is an ongoing harm arising from the Federal Defendants' procedural violations

10   with respect to the C'waam and Koptu. [*See* ECF No. 44 at 30–31]. Specifically, the Federal

11   Defendants' ongoing failure to recognize the obsolescence of the 2013 BiOp's treatment of UKL

12   elevations in the face of recent unanticipated dry conditions, Reclamation's actual management of the

13   Project, and declining C'waam and Koptu populations has created a risk of imminent harm to those

14   species. A protective preliminary injunction is a direct and appropriate remedy for this violation while a

15   new biological opinion is prepared.

16        B.  *Count III is Ripe for Review.*

17        The Klamath Tribes incorporate by reference section IV(B)(2) of their Combined Opposition to

18   Federal Defendants' and Intervenor-Defendants' Motions to Dismiss [ECF No. 33] and supporting

19   materials cited therein in response to Federal Defendants' present arguments that Count III of the

20   Klamath Tribes' complaint is not jurisdictionally or prudentially ripe. [*See* ECF No. 44 at 32–35]. To the

21   extent Federal Defendants' response brief's citation to *Center for Biological Diversity v. U.S. Bureau of*

22   *Reclamation*, No. 6:15-CV-02358-JR, 2016 WL 9226390, at *2 (D. Or. Apr. 6, 2016) raises an

23   argument not already addressed within the Klamath Tribes' Opposition, the Tribes supplement their

24   position here. [*See* ECF No. 44 at 34].

1    *Center for Biological Diversity* does not address the question of ripeness whatsoever. 2016 WL

2    9226390. At issue was whether, in light of the facts and circumstances, plaintiff's reinitiation claim

3    warranted a preliminary injunction, not whether the claim was jurisdictionally or prudentially ripe. *Id.*

4    The court ultimately declined to grant a preliminary injunction due to plaintiff's failure "to show that the

5    requested relief will, in fact, benefit the [listed species] pending resolution of this case," not because

6    plaintiff had failed to raise a justiciable issue. *Id.* at *5.

7          C.   *Count III States a Cognizable Claim against Each Federal Defendant.*

8          The Klamath Tribes incorporate by reference section IV(B)(1) & (C) of their Combined

9    Opposition to Federal Defendants' and Intervenor-Defendants' Motions to Dismiss [ECF No. 33] and

10   supporting materials cited therein in response to the Federal Defendants' present arguments that Count

11   III fails to state a claim upon which relief can be granted. [ECF No. 44 at 35–41].

12         In addition, it should be noted that Federal Defendants are now trying to repackage an argument

13   that this Court previously rejected in the *Hoopa Valley Tribe* and *Yurok Tribe* cases.  Specifically,

14   Federal Defendants assert that, "as consulting agencies," USFWS and NMFS "have no authority to

15   compel the start of reinitiated consultation." [ECF No. 44 at 36].  This Court previously found this

16   argument inconsistent with existing Ninth Circuit precedent, *Yurok Tribe*, 231 F. Supp. 3d at 461, and

17   nothing Federal Defendants have adduced here requires a contrary conclusion.

18   **IX.   The Balance of Equities and the Public Interest Both Favor the Requested Injunction**

19         As set forth above and in the opening brief [ECF No. 13 at 34-35], the Klamath Tribes are likely

20   to suffer irreparable harm in the absence of the Court's issuance of a preliminary injunction.

21   Consequently, the "unparalleled public interest in the 'incalculable' value of preserving endangered

22   species[,]'" *Cottonwood Envtl. Law Ctr. v. Forest Serv.,* 789 F.3d 1075, 1090 (9th Cir. 2015)(*quoting*

23   *Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 187-88 (1978)), means that the balance of equities

24   necessarily favors the Tribes and that the public interest is served by the issuance of the injunction.

Federal Defendants and Defendant-Intervenors labor to avoid this conclusion, most notably by focusing on the potential harm to the irrigators served by the Project from the injunction. But the C'waam and the Koptu's survival as viable species are dependent on it. As this Court recognized in the related *Hoopa Valley* and *Yurok* cases, "courts are not permitted to favor economic interests over potential harm to endangered species." 231 F.Supp.3d 450, 485 (N.D. Cal. 2017)(citing *Tennessee Valley Auth. v. Hill*, 437 U.S. at 184). "Congress has established that endangered species must be prioritized and courts may not use equity's scales to strike a different balance." 231 F.Supp. 3d at 485-86 (internal quotation marks and citations omitted). That rule applies with equal force in this case.

Federal Defendants and Defendant-Intervenors attempt to avoid this conclusion by asserting that the Klamath Tribes' requested injunction would pit the needs of the C'waam and Koptu against the needs of the listed SONCC coho salmon. As the Tribes have previously made clear, however, the goal of this suit is not to save the C'waam and Koptu at the expense of the SONCC coho salmon, which is also a tribal treaty resource. [*See, e.g.*,, ECF No. 33 at 19 n.2]. Nor are the species' needs in acute conflict, as Federal Defendants and Defendant-Intervenors overstate the likelihood of incompatibility between the Conservation Levels and the flows necessary for SONCC coho salmon, including as mandated by this Court's injunction entered in the *Hoopa Valley* and *Yurok* cases. To make their case, Federal Defendants rely exclusively on the Declaration of Jared Bottcher for the proposition that "[m]eeting (or attempting to meet) the requested lake elevations in future years could not be accomplished while meeting the needs of coho salmon pursuant to the 2013 BiOp and 2017 Court Injunction…." [ECF No. 44 at 47 (quoting ECF No. 44-11 at ¶25)].[7] This statement is apparently predicated on the information Bottcher sets forth in ¶¶ 22-23 of his declaration, where he presents and discusses a table (labeled Table 2) that purports to illustrate why the Conservation Levels will inevitably

---

[7] Defendant-Intervenors rely solely on the conclusory statement set forth in the declaration of Brad Kirby. [ECF No. 39 at ¶64].

COMBINED REPLY TO OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION          30          3:18-CV-03078

conflict with the SONCC coho salmon flows irrespective of how Reclamation manages irrigation deliveries for the Project. [ECF No. 44-11 at ¶¶ 22-23]. Bottcher explains that, using a 2005-2016 period of record and looking at median Project diversions, Table 2 depicts how much water might be required during each month to meet the Conservation Levels and how much water otherwise earmarked for delivery to Project irrigators would be available on average to meet the Conservation Levels in a given month. [*Id.* at ¶ 23]. Bottcher asserts that any deficit that could not be made up by irrigation water would necessarily have to be subtracted from SONCC coho salmon flows. [*Id.*].

Yet Table 2 is egregiously misleading because it looks at each month's Conservation Level in a vacuum, thereby dramatically inflating the volume of water necessary to meet the Conservation Levels in each successive month.[8] [Ex. A at ¶49]. Taking, for example, the second and third lines of the Table [ECF No. 44-11 at ¶ 22, lines 14-15], if the Conservation Level of 4,143.0 feet is met at the end of April, an additional 80,000 acre-feet of water would not be needed to raise UKL from its median period of record elevation of 4,142.0 feet in May *because the Lake would already be at 4,143.0*. There would therefore not be a 34,000 acre-foot deficit (the difference between median Project deliveries for May and the purported increased volume needed) requiring the withholding of water otherwise earmarked for SONCC coho salmon flows. This double-counting error infects the entire Table. [Ex. A at ¶49].

Nor is the first line of the Table any more accurate. It suggests that 47,000 acre-feet of water would be needed to raise UKL elevations to the end-of-March Conservation Level of 4,143.0 feet from its median March elevation of 4,142.5 feet and that this would need to come entirely from SONCC coho salmon flows as there are generally no irrigation deliveries being made during that month. Yet part of what the Tribes seek through this preliminary injunction motion, and what the Conservation Levels prescribe, is for Reclamation to keep UKL at a higher elevation coming out of the end of the prior

---

[8] It is ironic that the modeling done to prepare Table 2, apparently solely for purposes of this litigation, bears resemblance (though using a more limited period of record) to the modeling request the Klamath Tribes made to Reclamation in December of 2017, which Reclamation declined to run. [*See* ECF No. 33 at 12-13].

season, thereby increasing the volume of water available to meet the end-of-March Conservation Level. [Ex. A at ¶50]. Bottcher himself concedes that Reclamation is capable of reaching the end-of-September Conservation Level this year. [ECF No. 44-11 at ¶ 19]. With appropriate management, therefore, the risk of conflict between Conservation Levels and SONCC coho salmon flows is that much further diminished.[9]

While legally insufficient to outweigh the risks to the endangered C'waam and Koptu, the Klamath Tribes recognize the significant potential consequences that could flow from Reclamation's efforts to meet the September Conservation Level this year. But these consequences are, at least to a great extent, of Reclamation's own making. Modeling presented by Reclamation this past January demonstrated that the later-season Conservation Levels could have been met this year alongside the SONCC coho salmon flows ordered by this Court. [*See* Materials from Reclamation January 31, 2018 Presentation at slide 10, attached hereto as **Exhibit C** (illustrating that both higher UKL levels and sufficient SONCC coho salmon flows were achievable this year)]. Had Reclamation adopted the Conservation Levels as part of its 2018 Operations Plan, as the Tribes repeatedly requested of it, the irrigators would have had much more certainty in making investment and planting decisions and would not now be facing many of the harms the Federal Defendants and Defendant-Intervenors stress in their filings in opposition to the Tribes' preliminary injunction motion. [*See, e.g.*, Letter from Klamath Tribes to Reclamation, June 14, 2018, attached hereto as **Exhibit D**].

To advance their arguments about the balance of equities and public interest, Federal Defendants and Defendant-Intervenors both cite *Center for Biological Diversity v. U.S. Bureau of Reclamation*, 2016 WL 9226390 (D. Or. 2016) ("*CBD*"). That case is distinguishable. In *CBD*, the plaintiffs sought a mandatory injunction to protect the Oregon spotted frog from the effects of certain Reclamation-

---

[9] As noted above, the Tribes are not heedlessly seeking to privilege C'waam and Koptu needs over those of the SONCC coho salmon. Rather, we seek to ensure that the Federal Defendants live up to their ESA obligations to all three species.

COMBINED REPLY TO OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION
32
3:18-CV-03078

controlled dams during the pendency of Reclamation's consultation with FWS about the effects of its project. *Id.* at *2. After finding that neither of the plaintiffs' claims under Section 7 of the ESA were sufficiently strong to warrant mandatory injunctive relief, the court turned to the Section 9 claim and found that the plaintiffs had failed to show that the continued operation of the project was risking take at the species rather than the individual level, which the court construed as necessary to support issuance of a mandatory injunction. *Id.* at * 3-4. Too, the plaintiffs had conceded at oral argument that specific interim measures being undertaken by Reclamation in coordination with USFWS during the pendency of the reconsultation process were in fact benefitting the Oregon spotted frog. *Id.* at *4. Furthermore, the evidentiary support for the plaintiffs' requested relief was predicated mainly "on the limited observations of one individual over the course of several weeks." *Id.* at *5. It was in the context of that record that the court concluded that the balance of hardships did not favor the plaintiffs and that their requested relied would be contrary to the public interest. *Id.*

The Klamath Tribes would be delighted if Reclamation and USFWS were taking similar interim measures here to ensure the continued viability of the C'waam and the Koptu during the pendency of the current reconsultation process. Indeed, such steps might have obviated the need for this suit. But that is unfortunately not the case. Rather, Reclamation continues to operate as though the 2013 BiOp is perfectly adequate for the protection of the species. [*See*, *e.g.*, ECF No. 40-2 at 1-2]. Moreover, as demonstrated by Mark Buettner's Declarations [ECF No. 13-3][Ex. A], the Tribes' proposed Conservation Levels are based on the best available science, not mere short-term anecdotal observations, and would indeed "remedy the harm allegedly caused by the [Project's] operations[.]" *CBD*, 2016 WL 9226390 at *5. And the harms that would be remedied by the Tribes' requested injunction are incontrovertibly at the species level. As the 2013 BiOp itself recognized, C'waam and Koptu "populations, especially the [Koptu] population in UKL, are at a high risk of extinction[,]" [ECF No. 13–2 at § 7.5], and "UKL is critically important to these species…." [*Id.* at §7.10]. Indeed, even

1    "[g]oing into the [2013] consultation, it was clear that the status and environmental baseline of the LRS

2    and SNS was highly degraded, so that even small adverse effects to the species were likely to reduce

3    their viability." [*Id.* at § 10.6]. By protecting the aging populations of C'waam and Koptu in UKL, the

4    Conservation Levels are geared precisely toward preventing species-level harm. [*See* Ex. A at ¶ 28].

5    *CBD* therefore does not support Federal Defendants' and Defendant-Intervenors' position.

6         Nor does the Federal Defendants' invocation of flood control and levee risks countermand the

7    conclusion that the balance of equities and the public interest both favor the Klamath Tribes' requested

8    relief. [*See* ECF No. 44 at 56]. The Tribes specifically recognized in the Preliminary Injunction motion

9    that the end-of-March Conservation Level needed to be subject to applicable flood control operations.

10   [ECF No. 13-1 at 2-3]. To the extent Reclamation now asserts that the April Conservation Level might

11   also be inconsistent with flood control operations, [*see* ECF No. 44 at 47 (quoting ECF No. 44-11 at ¶

12   24], the Tribes would not object to the Court entering an injunction making the April Conservation

13   Levels similarly subject to the applicable flood control operations. The Project's flood control

14   operations, as detailed in the 2012 Biological Assessment that underlies the 2013 BiOp [ECF No. 40 at §

15   4.3.2.2.3], are designed to address the concern about the levees that Bottcher raises in his

16   declaration. [ECF No. 44-11 at ¶ 25]. Moreover, the maximum elevations for flood control operations

17   already contemplate UKL remaining above 4,143 feet for an extended period of time. [ECF No. 40 at §

18   4.3.2.2.3]. Bottcher's declaration provides no basis for concluding that further extending operations at

19   that level would pose any greater risks to public health and human safety. The balance of equities favors

20   the Klamath Tribes and the requested injunction would further the public interest in the prevention of the

21   extinction of endangered species.

22   **X.      A Bond Is Neither Necessary Nor Appropriate.**

23        The Court should reject Defendants-Intervenors' request to require the posting of a bond should

24   the Court grant the Klamath Tribes' motion and issue a preliminary injunction. As the Ninth Circuit has

recognized, a district court "has discretion as to the amount of security required, if any[,]" when granting a preliminary injunction. *Diaz v. Brewer*, 656 F.3d 1008, 1015 (9th Cir. 2011) (internal quotation marks and citation omitted). This exercise of this discretion to require no bond is particularly warranted here as a bond requirement—particularly in the astronomical amount requested by the Defendants-Intervenors—would seriously compromise the Klamath Tribes' ability to pursue this litigation. *See People of State of Cal. ex rel. Van De Kamp v. Tahoe Regl. Plan. Agency*, 766 F.2d 1319, 1325 (9th Cir. 1985), *amended*, 775 F.2d 998 (9th Cir. 1985) ("The court has discretion to dispense with the security requirement [of Fed. R. Civ. P. 65(c)], or to request mere nominal security, where requiring security would effectively deny access to judicial review"); [**Ex. E** (Declaration of Don Gentry and Brandi Hatcher)]. This would be a particularly disfavored outcome given that the Circuit has cautioned that "special precautions to ensure access to the courts must be taken where Congress has provided for private enforcement of a statute[,]"*Tahoe Regl. Plan. Agency*, 766 F.2d at 1326, such as is the case with the ESA. *See* 16 U.S.C. § 1540(g)(1). Moreover, it appears that Defendants-Intervenors' request is purely punitive, as they baselessly assert as part of its justification that "Plaintiff chose to seek a remedy at a time that would inflict the worst possible damage on the agricultural community." [ECF No. 38 at 48]. As discussed above, the Klamath Tribes have not unreasonably delayed the prosecution of this action. Rather, they have acted diligently in trying to protect the C'waam and the Koptu in all available forums through education and cooperation. Litigation was not the Tribes' first choice, but it has become necessary due to Reclamation's actions and omissions in operating the Project since the issuance of the 2013 BiOp. The Tribes do not seek to gratuitously inflict wanton pain on their neighbors in the irrigation community, and they seek a preliminary injunction despite, not because of, its potential adverse impacts on others. They seek to preserve the continued existence of two extremely vulnerable and critically important species from near-term extirpation in UKL and extinction while this litigation progresses and until a longer-term solution can be found. Under these circumstances, imposition of a

1   bond is not warranted.  Should the Court nonetheless consider requiring a bond, only a nominal amount

2   should be set.  *Cf. Davis v. Mineta*, 302 F.3d 1104, 1126 (10th Cir. 2002)**.**

3   **XII.   CONCLUSION**

4   For the foregoing reasons, the Klamath Tribes respectfully request the Court grant the Tribes'

5   request for a Preliminary Injunction.

6   Respectfully submitted this _____ day of July, 2018.

7
/s/ Jeremiah D. Weiner_____
Jeremiah D. Weiner (CSBA No. 226340)
8   ROSETTE, LLP

9   *Attorneys for Plaintiff*
*The Klamath Tribes*

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24