UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

THE KLAMATH TRIBES,

        Plaintiff,

    v.

UNITED STATES BUREAU OF
RECLAMATION, et al.,

        Defendants.

Case No. 18-cv-03078-WHO

**ORDER TRANSFERRING VENUE AND
DENYING MOTION FOR
PRELIMINARY INJUNCTION
WITHOUT PREJUDICE**

Re: Dkt. Nos. 13, 17, 18

## INTRODUCTION

The Klamath Tribes have filed suit for declaratory and injunctive relief to protect two endangered species of sucker fish from risk of extinction surrounding the operation of the Klamath Irrigation Project ("Project"). They move for a preliminary injunction to require the United States Bureau of Reclamation ("Bureau") to maintain the water in the Upper Klamath Lake during the irrigation season of 2018 at elevation levels suggested in a controlling Biological Opinion issued jointly by the United States Fish and Wildlife Service ("FWS") and National Marine Fisheries Service ("NMFS"). The Bureau, FWS, and NMFS (collectively, "federal defendants") as well as Klamath Water Users Association, Sunnyside Irrigation District, and Ben DuVal (collectively, "intervenors"), oppose the preliminary injunction and move to dismiss this case for improper venue, or alternatively to transfer venue. The federal defendants also move to dismiss Count III as nonjusticiable, and contend that Count III should at least be dismissed against NMFS because it lacks jurisdiction over the protected sucker fish. Various amici have filed briefs expressing their positions on venue and the preliminary injunction.

While venue may be proper in the Northern District of California, it is more appropriate in the United States District Court for the District of Oregon: the Klamath Tribes are headquartered

there, the sucker fish are there, the Upper Klamath Lake is there, and the Bureau and FWS have offices there. Only NMFS has an office in the Northern District, and it may not be long for this case given problems with Count III. I will let the transferee court address the pleadings as it will.

There is reason for all parties to give urgent focus to the health of the sucker fish. The federal defendants represent that this is already happening, and I encourage the engaged scientists for all parties to work collaboratively and expeditiously to protect the sucker fish. The Klamath Irrigation Project is complex, and the endangered species within it are of paramount importance under the Endangered Species Act. That said, while this is a close case, the Klamath Tribes have not convinced me on this record that they are likely to prevail on the merits or that the sucker fish will suffer irreparable harm if I do not grant the relief the Klamath Tribes seek. There is substantial disagreement whether the lake elevation level is causing injury to the sucker fish, but there is no doubt that granting a mandatory injunction that cuts off water to the Klamath Irrigation District will cause substantial harm to others that depend on it, including wildlife refuges, farmers and ranchers. The motion for preliminary injunction is DENIED.

## BACKGROUND

### I.     FACTUAL BACKGROUND

This case aims to protect two endangered species of sucker fish from future extinction, the C'waam (Lost River sucker, *Deltistes luxatus*) and Koptu (shortnose sucker, *Chasmistes brevirostris*), that are revered by the Klamath Tribes for their cultural, spiritual, and economic significance. Mot. for Preliminary Injunction ("PI Mot.") at 2 (Dkt. No. 13). Upper Klamath Lake is the largest freshwater lake in Oregon and the primary habitat for these species. *Id*. at 4. Water from Upper Klamath Lake is the primary source for the Klamath Irrigation Project, which is operated by the Bureau. Federal Defs.' Mot. to Dismiss ("Federal MTD") at 5 (Dkt. No. 18). The Project includes a system of interconnected rivers, reservoirs, canals, lakes, dams, and marshes that allow the Bureau to regulate water levels in Upper Klamath Lake. *Id*.

The Klamath Tribes, the federal defendants, and the Project share a history that I will restate briefly. The United States entered a treaty in 1864 with the Klamath Tribes, granting them water rights within the Klamath Basin and fishing rights. PI Mot. at 3. After an Act of Congress

in 1905, the Project was authorized to begin construction, diverting water from the Klamath Basin and Upper Klamath Lake for municipal, agricultural, and hydroelectric uses. *Id*. The Bureau manages the Project and is bound by a 2013 Biological Opinion ("2013 BiOp"), including its incidental take statement ("ITS") and terms and conditions. *Id*. at 15-16. The 2013 BiOp attempts to outline the projected impact of the Project on a list of threatened species, including the sucker fish, and contains threshold elevation levels for the Upper Klamath Lake that the Bureau should strive to maintain while it diverts water elsewhere. *Id*. at 14.

Diverting water decreases the elevation level of Upper Klamath Lake, and changes the nutrients that remain. Timber harvesting in the Klamath Basin and draining surrounding wetlands diminishes the water quality. *Id*. at 5. Algae blooms develop annually in Upper Klamath Lake from May to mid-July, changing the levels of dissolved oxygen in the lake. *Id*. at 9. The algae also increase phosphorus and pH levels, and un-ionized ammonia in the water can reach toxic levels for the sucker fish. *Id*. The 2013 BiOp considered low dissolved oxygen, high ammonia, high pH, algal toxins, and urban and agricultural run-off in its analysis. 2013 BiOp at § 10.1 at 190.

From 1968 to 1985, sucker fish harvests in Upper Klamath Lake decreased from over 100,000 to 687 per year. *Id*., Ex. C. ¶ 24. The Klamath Tribes suspended fishing the sucker fish in 1986, and limited their take to two fish per year for ceremonial purposes. *Id*. More recently after 2001, the Klamath Tribes estimate that approximately 100,000 C'waam and 20,000 Koptu remain in the lake. *Id*. at 6. These sucker fish are older on average and are reaching the end of their reproductive viability and life expectancy. *Id*.

In January 2017, the Bureau reinitiated formal consultation with NMFS and FWS regarding the Project's effects on the five listed species in the 2013 BiOp. Federal MTD, Ex. E. FWS is tasked with consulting on the sucker fish species and other inland fish species, while NMFS consults on the Coho salmon species in the region. *Id*. at Ex. D. ¶¶ 4, 6. Since March 2017, the Bureau has held meetings with the Klamath Tribes' water committee, and in February and March 2018, the federal defendants met with the Klamath Tribes at their headquarters in Oregon to discuss Upper Klamath Lake water elevations and the state of the sucker fish. Federal

MTD at 7.

## II.    PROCEDURAL BACKGROUND

On May 23, 2018, the Klamath Tribes filed their complaint in this case asserting four claims against the federal defendants.  Count I alleges that the Bureau violated Section 9 of the Endangered Species Act ("ESA"), prohibiting the unlawful "take" of any endangered species within the United States.  Compl. ¶ 79 (Dkt. No. 1).  Count II claims that the Bureau violated Section 7 of the ESA by continuously relying on the 2013 BiOp yet failing to maintain Upper Klamath Lake elevations according to its thresholds, jeopardizing the sucker fish.  *Id*. ¶¶ 91, 95.  Count III alleges that the federal defendants failed to reinitiate adequate consultation since they are not considering the effects of the Project on the sucker fish or their habitat.  *Id*. ¶ 103.  Lastly, Count IV claims that the Bureau did not comply with the National Environmental Policy Act ("NEPA") when it failed to prepare an environmental impact statement ("EIS") for the 2013 BiOp.  *Id*. ¶¶ 108, 110.

The Klamath Tribes seek a preliminary injunction to protect the endangered sucker fish during the course of this litigation.  Plaintiff requests that I order the Bureau to maintain Upper Klamath Lake at or above certain "conservation levels" during the 2018 irrigation season, and to maintain elevations into later applicable calendar periods according to the chart below.

| Date | Elevation Levels (feet above sea level) |
|------|------------------------------------------|
| March 31 | 4,143.0 feet |
| April 30 | 4,143.0 feet |
| May 15 | 4,143.0 feet |
| May 31 | 4,143.0 feet |
| June 15 | 4,143.0 feet |
| June 30 | 4,142.0 feet |
| July 15 | 4,141.5 feet |
| July 31 | 4,141.0 feet |
| August 15 | 4,140.5 feet |

| August 31 | 4,140.0 feet |
|---|---|
| September 15 | 4,139.5 feet |

*See* PI Mot., Ex. A.

The federal defendants and intervenors moved to dismiss the plaintiff's complaint for improper venue, or alternatively to transfer to a proper venue. Federal MTD at 11; Intervenors Mot. to Dismiss ("Intervenors MTD") at 1 (Dkt. No. 18). After the motion for preliminary injunction and federal defendant motion to dismiss, the hearing date was reset pursuant to stipulation by the parties so each would be heard at the same time.

## MOTION TO DISMISS

The federal defendants and intervenors move to dismiss the Klamath Tribes' claims. Federal MTD at 1; Intervenors MTD at 1. They seek to dismiss all claims for improper venue. The federal defendants also move to dismiss Count III for failure to state a claim. Federal MTD at 19. They argue that their mandatory duty is limited to reinitiating consultation, which has already been initiated. Relatedly, since reconsultation is not yet complete, they contend that plaintiff lacks standing and Count III is not ripe for review. *Id*. at 20. Finally, federal defendants assert that NMFS does not have jurisdiction over the sucker fish in this litigation and cannot be liable for a failure to reinitiate consultation. *Id*. at 24.

## LEGAL STANDARD

### I. LACK OF SUBJECT MATTER JURISDICTION

The Article III case or controversy requirement limits federal courts' subject matter jurisdiction by requiring, among other things, that plaintiffs have standing and that claims be "ripe" for adjudication. *Allen v. Wright*, 468 U.S. 737, 750 (1984). The party asserting federal subject matter jurisdiction bears the burden of proving its existence. *See Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 377 (1994). Standing addresses whether the plaintiff is the proper party to bring the matter to the court for adjudication. *See Allen*, 468 U.S. at 750-51. The related doctrine of ripeness is a means by which federal courts may dispose of matters that are premature for review because the purported injuries are too speculative and may never occur. Because standing and ripeness pertain to federal courts' subject matter jurisdiction, they are properly raised

in a Rule 12(b)(1) motion to dismiss.  *See St. Clair v. City of Chico*, 880 F.2d 199, 201 (9th Cir. 1989); *see also White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000).

## II.     IMPROPER VENUE

A motion to dismiss for improper venue is governed by Federal Civil Procedure Rule 12(b)(3).  If the propriety of venue is challenged under Rule 12(b)(3), the plaintiff bears the burden of proving that venue is proper.  *Piedmont Label Co. v. Sun Garden Packing Co.*, 598 F.2d 491, 496 (9th Cir. 1979).  When considering a motion to dismiss for improper venue, a court need not accept the pleadings as true and may consider facts outside of the pleadings.  *See Doe 1 v. AOL, LLC*, 552 F.3d 1077, 1081 (9th Cir. 2009).  Facts supporting venue may be established by declaration, affidavit, or other evidence.  *Ziegler Chemical and Mineral Corp. v. Standard Oil Company*, 32 F.R.D. 241, 243 (N.D. Cal. 1962).  The decision to dismiss for improper venue, or alternatively to transfer venue to a proper court, is a matter within the sound discretion of the district court.  *See King v. Russell*, 963 F.2d 1301, 1304 (9th Cir. 1992).

## III.    FAILURE TO STATE A CLAIM TO RELIEF

Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint if it fails to state a claim upon which relief can be granted.  To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face."  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).  A claim is plausible when the plaintiff pleads facts that "allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).  There must be "more than a sheer possibility that a defendant has acted unlawfully."  *Id*. While courts do not require "heightened fact pleading of specifics," a plaintiff must allege facts sufficient to "raise a right to relief above the speculative level."  *See Twombly*, 550 U.S. at 555, 570.

In deciding whether the plaintiff has stated a claim upon which relief can be granted, the Court accepts the plaintiff's allegations as true and draws all reasonable inferences in favor of the plaintiff.  *See Usher v. City of Los Angeles*, 828 F.2d 556, 561 (9th Cir. 1987).  However, the court is not required to accept as true "allegations that are merely conclusory, unwarranted deductions of

fact, or unreasonable inferences." *See In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).

If the court dismisses the complaint, it "should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *See Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000). In making this determination, the court should consider factors such as "the presence or absence of undue delay, bad faith, dilatory motive, repeated failure to cure deficiencies by previous amendments, undue prejudice to the opposing party and futility of the proposed amendment." *See Moore v. Kayport Package Express*, 885 F.2d 531, 538 (9th Cir.1989).

## DISCUSSION

### I.   IS VENUE PROPER?

Civil actions may be brought "in any judicial district in which (A) a defendant in the action resides, (B) a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (C) the plaintiff resides if no real property is involved in the action." 28 U.S.C. § 1391(e)(1). The federal defendants and intervenors argue that this court is an improper venue for the Klamath Tribes' case.

The federal defendants contend that plaintiff's claims are isolated to managing the elevations in Upper Klamath Lake in Oregon, not the waters that flow from Upper Klamath Lake to the Klamath River in Northern California. Federal MTD at 12. The intervenors add that defendants do not reside here and have no offices in the district, that the sucker fish habitat is entirely in Oregon's Upper Klamath Lake, and that the Klamath Tribes reside in Oregon. Intervenors MTD at 3-4. The defendants ask to dismiss the case, or in the alternative, transfer it to a proper venue. With regard to transferring venue, the federal defendants request the District of Oregon or the District of Columbia, and intervenors request transfer to the Eastern District of California. Whether venue is proper in the Northern District of California is not obvious, but the District of Oregon is clearly more appropriate to hear this case.

### A.   Substantial Events Giving Rise to Plaintiff's Claims Did Not Occur Here

To determine whether venue is proper courts analyze the facts according to 28 U.S.C. §

United States District Court
Northern District of California

1391, unless the statute in question has an applicable venue provision.  Here, the Klamath Tribes do not assert venue under the applicable ESA venue provision, and instead claim venue:

> under 28 U.S.C. §§ 84(a) and 1391(b) because a substantial part of the events or omissions giving rise to the Klamath Tribes' claims either occurred within or directly impact the district, and a substantial part of the property subject of this action–the Project–is situated within this district. The action area for [FWS's] portion of the 2013 BiOp, which includes the provisions related to C'waam and Koptu, includes both southern Oregon and northern California.

Compl. at ¶ 8 (Dkt. No. 1).

The parties have repeated the applicable law that only events "that directly give rise to a claim are relevant" to the substantiality analysis.  *Lawler v. Tarallo*, No. C13-03284 MEJ, 2013 U.S. Dist. LEXIS 152412, *8 (N.D. Cal Oct. 23, 2013).  When venue is challenged the plaintiff bears the burden to establish it is proper.  *R. Griggs Group Ltd. v. Consolidated Shoe, Inc.*, 1999 U.S. Dist. LEXIS 5426, *10-11 (N.D. Cal. Apr. 8, 1999).  In these types of cases, the location of the species is routinely considered.  *See e.g., Northwest Forest Resource Council v. Babbit*, 1994 WL 908586, at *2 (D.D.C. April 13, 1994).

The federal defendants and intervenors emphasize several key facts supporting their position that significant events gave rise to claims in the District of Oregon or the Eastern District of California.  For instance, the Bureau's "day-to-day management of the Klamath Project" occurs in their Klamath Falls, Oregon office with occasional input from Washington, D.C., or their Sacramento, California offices.  *See* Federal MTD at 12; Bottcher Decl., Ex. F ¶¶ 7-8, 11.  This means decisions related to elevation levels in Upper Klamath Lake, the decision to reinitiate consultation, and the decision not to prepare an environmental impact statement, all occurred outside this district.  There is also no dispute that Upper Klamath Lake, the sucker fish, and the Klamath Tribes all reside in Oregon.  Intervenors MTD at 5; Danosky Decl. ¶ 3.

In response, the Klamath Tribes argue that the federal defendants and intervenors ignore that courts consider "the entire sequence of events underlying the claim."  *Mitrano v. Hawes*, 377 F.3d 402, 405 (4th Cir. 2004) (discussing similar provisions in 28 U.S.C. § 1391(a)(2); *see also ALO, LLC v. Falsetti*, No. 218CV00208CASSKX, 2018 WL 1384457, at *4 (C.D. Cal. Mar. 15, 2018) (finding improper venue under 28 U.S.C. § 1391(b) because the sequence of events giving

8

rise to the tort alleged did not substantially occur in the district).  Relying on this line of reasoning, the Klamath Tribes argue that the 2013 BiOp, developed largely in the Northern District, is a pertinent part of the sequence of events giving rise to their claims and venue here.  In addition, the NMFS has an office in this district and is part of the reinitiated consultation on the 2013 BiOp.

Considering the facts and arguments presented, I conclude that venue should be in the District of Oregon.  The Klamath Tribes' headquarters is in Oregon, the sucker fish and their habitat in Upper Klamath Lake is in Oregon, FWS (which has jurisdiction over the sucker fish) is in Oregon, and the Bureau's actions giving rise to plaintiff's concerns about the sucker fish occurred in Oregon.  Although the 2013 BiOp is a document underlying plaintiff's claims and is undoubtedly related to this district, the Klamath Tribes are not challenging the validity of the 2013 BiOp.  While the BiOp is relevant to the issues here, it is the Bureau's actions in Oregon while carrying out the BiOp that gave rise to the Klamath Tribes' claims.  And while defendant NMFS has an office in this District, it is only named in Count III, and has a far more peripheral role regarding the sucker fish than the other defendants.

The Klamath Tribes also mention the prior litigation I presided over regarding Coho salmon and lower Klamath River.  *See Yurok Tribe v. United States Bureau of Reclamation*, 231 F. Supp. 3d 450, (N.D. Cal. 2017); *Hoopa Valley Tribe v. Nat'l Marine Fisheries Serv.*, 230 F. Supp. 3d 1106, (N.D. Cal. 2017).  I have found no case suggesting that this would confer venue in the absence of operative facts occurring in the district, and the Klamath Tribes cite none.  To be sure, environmental cases have considered past litigation in the district when determining whether substantial parts of events giving rise to claims occurred in that district.  *See e.g.*, *Desert Survivors v. US Dep't of the Interior*, No. 16-CV-01165-JCS, 2016 WL 3844332, at *6 (N.D. Cal. July 15, 2016) (denying transfer of venue, in part because past litigation on the same issue and same species occurred in the current district).  But there is not a single case that concludes, as a rule, prior related litigation confers venue or "that prior litigation necessarily favors a certain venue." *Forest Guardians v. Kempthorne*, No. 06-CV02560-L(LSP), 2007 WL 2572287, at *3 (S.D. Cal. Sept. 5, 2007).  Though the amount of water released from Upper Klamath Lake is relevant to the *Yurok* and *Hoopa Valley Tribe* injunction, there is no authority suggesting that this sort of

1    environmental relationship creates venue where none of the other operative facts support it.

2    **B.    Substantial Parts of the Property Subject of this Action Are Not in the District**

3    The Klamath Tribes also argue that venue is proper because the Project is a substantial part

4    of the property subject of this action. This is unpersuasive. The federal defendants emphasize that

5    while the Klamath Basin is in this district, the Project is located within Oregon and the Eastern

6    District of California. The Project area may span multiple districts, but the claims here concern

7    the federal defendants' compliance with the ESA and NEPA in relation to the sucker fish habitat

8    in Upper Klamath Lake in Oregon. No part of this lawsuit directly concerns property outside the

9    Upper Klamath Lake area, or arguably any property dispute at all.

10    In sum, there may be a basis for the assertion of venue in this district, but it is weak. Given

11    the significance of the issues in dispute and potential harm to the sucker fish, I will transfer the

12    case in the interest of justice. 28 U.S.C. § 1406(a). For the reasons discussed below, the District

13    of Oregon is more appropriate than the District of Columbia or the Eastern District of California.

14    **C.    The District of Oregon is a More Appropriate Forum**

15    I may transfer any civil action to another district "where it might have been brought or to

16    any district or division to which all parties have consented." 28 U.S.C. § 1404(a). Section 1404(a)

17    "requires two findings—that the district court is one where the action might have been brought

18    and that the convenience of parties and witnesses in the interest of justice favors transfer." *Hatch*

19    *v. Reliance Ins. Co.*, 758 F.2d 409, 414 (9th Cir. 1985) (quotations omitted). The "district court

20    has discretion to adjudicate motions for transfer according to an individualized, case-by-case

21    consideration of convenience and fairness." *Jones v. GNC Franchising, Inc.*, 211 F.3d 495, 498

22    (9th Cir. 2000) (quotations omitted).

23    The court must weigh, "private and public interest factors affecting the convenience of the

24    forum" when transferring a case. *Id.* These factors include:

25    (1) the plaintiff's choice of forum; (2) the convenience of the parties; (3) the
convenience of the witnesses; (4) ease of access to evidence; (5) familiarity of each

26    forum with the applicable law; (6) feasibility of consolidation of other claims; (7)
any local interest in the controversy; and (8) the relative court congestion and time

27    [to] trial in each forum.

28    *Gerin v. Aegon USA, Inc.*, No. C06-5407-SBA, 2007 WL 1033472, at *4 (N.D. Cal. Apr. 4, 2007)

(citing *Jones*, 211 F.3d at 498-99).

### 1. Plaintiff's Choice of Forum Deserves Only Minimal Deference

Courts typically give plaintiff's choice of forum "substantial deference," such that defendants bear considerable burden to justify a transfer. *Ctr. for Biological Diversity v. McCarthy*, No. 14-CV-05138-WHO, 2015 WL 1535594, at *3 (N.D. Cal. Apr. 6, 2015). However, even if venue is proper here, when the environmental impact alleged is not in the district chosen and defendants move to transfer to the affected area, then plaintiff's chosen forum is given less consideration. *See e.g.*, *Sierra Club v. U.S. Defense Energy Support Center*, No. C 10-02673-JSW, 2011 U.S. Dist. LEXIS 4090, 2011 WL 89644, at *3 (N.D. Cal. Jan. 11, 2011) (giving the chosen forum little weight because "the underlying action is not connected to the Northern District of California."); *Sierra Club v. U.S. Dep't of State*, No. C 09-04086-SI, 2009 WL 3112102, at *3 (N.D. Cal. Sept. 23, 2009) (giving the chosen forum little weight where none of the operative facts occurred within the district and the district had little interest in the parties or subject matter).

Here, I find that the choice of forum would deserve only minimal deference because the underlying actions by the defendants occurred entirely outside this district, the affected species and habitat is entirely in Oregon, and the plaintiff is in Oregon. Although a court's decisions concerning the sucker fish and use of water from Upper Klamath Lake could theoretically affect the Coho salmon and water in Northern California, all the operative facts indisputably occurred outside this district.

### 2. The Convenience Factors Are Neutral

The federal defendants and intervenors contend that all the defendants' offices (except NMFS, which they argue is inappropriately named as a defendant), their witness testimony, the sucker fish habitat, and the operation of the Project are in Oregon and lean towards transferring venue to Oregon. Federal Reply in Supp. of Mot. to Dismiss ("Federal Reply") at 11, n. 5. Intervenors add that the Eastern District of California is where plaintiff and intervenors counsel are located. Intervenors MTD at 6. No specific argument was offered for whether it is more convenient to hear this case in the District of Columbia.

When considering the convenience of the parties, courts consider the location of the parties

relative to the forum and the ease of the parties' participation in the litigation. *See Alaska Wilderness League v. Jewell*, F. Supp. 3d 112, 120 (D.D.C. 2015). But counsel's location is not appropriate to consider. *Ctr. for Biological Diversity v. Exp.-Imp. Bank of the United States*, No. C 12-6325-SBA, 2013 WL 5273088, at *6 (N.D. Cal. Sept. 17, 2013). In contrast to most cases, environmental cases typically are "resolved by the court examining the administrative record to decide cross-motions for summary judgment...There are no witnesses to consider, and documentary evidence is as easily provided in one venue as another, especially in this age of electronic transmission." *Ctr. for Biological Diversity v. Kempthorne*, No. C–07–0894-EDL, 2007 WL 2023515, at *5 (N.D.Cal. July 12, 2007) (internal quotation marks omitted).

The convenience factors are neutral. I do not consider the location of counsel, and particularly in these types of cases documentary evidence can be easily gathered and provided across venues. Neither party has identified inconveniences unique to a specific district that could be eliminated elsewhere.

### 3. Oregon has the Strongest Localized Interest

In contrast to the convenience factors, the localized interest factor weighs heavily in favor of transferring to Oregon. Courts consider the "the current and transferee forums' interests in having localized controversies decided at home." *McCarthy*, 2015 WL 1535594, at *4 (internal quotations omitted). In addition, courts consider specific environmental locales or the location of the protected species that "can give certain districts an especially acute interest" in deciding cases there. *Animal Legal Def. Fund v. U.S. Dep't of Agric.*, No. CV 12-4407-SC, 2013 WL 120185, at *6 (N.D. Cal. Jan. 8, 2013) (citing *Ctr. for Biological Diversity v. Lubchenco*, No. C-09-4087-EDL, 2009 WL 454169, at *6–7 (N.D. Cal. Nov. 30, 2009)).

The District of Oregon is where Upper Klamath Lake and the sucker fish are located, where the challenged actions of the federal defendants occurred, where their offices are located, and where the Klamath Tribes' headquarters are located. It is clear that multiple districts have some level of localized interest, but Oregon has a direct and acute interest in the outcome of this case. Accordingly, I will DENY the motion to dismiss for improper venue, but I will GRANT the motion to transfer venue.

## II.     IS THERE A COGNIZABLE CLAIM FOR COUNT III?

In addition to venue, the federal defendants argue that Count III, which alleges a failure to reinitiate adequate consultation under Section 7 of the ESA, is not cognizable. I will leave the pleading issues to the court in Oregon. But because I address Count III within the preliminary injunction analysis, I have summarized the four main arguments posed in defendants' motion to dismiss below.

First, the federal defendants argue that Count III fails to state a claim of a mandatory legal duty. They stress that reconsultation claims "can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*." *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 64 (2004). Since reinitiating consultation is the only discrete action that the Bureau believes it was required to take, defendants insist there is no claim upon which relief can be granted for failure to provide "assurances" or reinitiate "adequate" consultation. Federal MTD at 20.

Second, defendants challenge standing and whether Count III is ripe for review. The federal defendants argue that the Klamath Tribes cannot establish an injury in fact since a new BiOp has not yet been completed. Federal MTD at 21. They also argue that any alleged failure to provide "assurance" about consultation or the new BiOp, is not currently harming the sucker fish. *See* Reply in Supp. of Federal MTD at 15 (Dkt. No. 53). Rather, defendants believe the appropriate action is to wait until the consultation is complete to challenge whether it is adequate or not. *Id.*

Third, the federal defendants posit that Count III fails to state a claim against FWS and NMFS because consulting agencies have no authority to compel the start of reinitiated consultation. Federal Opp. to PI Mot. ("Federal Opp.") at 36 (Dkt. No. 44). I discussed this argument in *Yurok* and *Hoopa Valley*, but the federal defendants claim that a different outcome is appropriate here.

Finally, the defendants challenge Count III against the NMFS specifically, arguing that the agency lacks jurisdiction to consult over the sucker fish. Federal MTD at 24, Ex. D ¶¶ 4-8. They contend that 16 U.S.C. § 1540(g)(1) requires an acting agency (i.e. the Bureau) and a consulting

agency (i.e. FWS or NMFS) to reinitiate formal consultation if "the amount or extent of taking specified in the incidental take statement is exceeded" or if "new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered." 50 C.F.R. § 402.16. But the federal defendants assert that FWS has exclusive jurisdiction over the listed suckers at issue in this case, not the NMFS. *See id.*; 50 C.F.R. § 17.11.

To repeat, I will withhold ruling on the plausibility of Count III or on any of the arguments that the federal defendants present. It is worth noting a critical difference between this case and the *Yurok* and *Hoopa Valley* cases, however. There, the federal defendants failed to comply with the 2013 BiOp to reinitiate consultation despite a mandatory duty to do so. Here, the reinitiated consultation began one and a half years before the litigation was filed. That said, it is up to the transferee court in the District of Oregon to make its own determination on the plausibility of the claim.

## MOTION FOR PRELIMINARY INJUNCTION

The Klamath Tribes seek a preliminary injunction requiring the Bureau to maintain Upper Klamath Lake elevations at or above certain minimums during the irrigation season of 2018 and through the resolution of this litigation. *See* PI Mot. at 2, Ex. A. Relief would enjoin Project operations below these elevations until reconsultation is complete. PI Mot. at 31. The federal defendants challenge all the elements of the preliminary injunction analysis.

The mandatory injunction sought would be an extraordinary remedy. While I am transferring the case to the District of Oregon, I considered the motion because of the serious allegations of imminent harm. On this record, the scientific evidence is very much in dispute, and I cannot conclude that the Klamath Tribes are likely to prevail on the merits nor that the sucker fish are suffering irreparable injury as a result of the lake elevation levels. The motion is DENIED.

## LEGAL STANDARD

Federal Rule of Civil Procedure 65 governs preliminary injunctions. A preliminary injunction may be issued if a plaintiff establishes: (i) likelihood of success on the merits; (ii) likelihood of irreparable harm in the absence of preliminary relief; (iii) that the balance of equities

tips in their favor; and (iv) that an injunction is in the public interest. *See Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "Injunctive relief [is] an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Id.* at 22. The Ninth Circuit has held that "'serious questions going to the merits' and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the other two elements of the *Winter* test are also met." *See Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1132 (9th Cir. 2011). "Serious questions need not promise a certainty of success, nor even present a probability of success, but must involve a 'fair chance of success on the merits.'" *National Wildlife Fed'n v. Coston*, 773 F.2d 1513, 1517 (9th Cir.1985). The test considers that "if the balance of harm tips decidedly toward the plaintiff, then the plaintiff need not show as robust a likelihood of success on the merits as when the balance tips less decidedly." *Benda v. Grand Lodge of Int'l Ass'n of Machinists & Aerospace Workers*, 584 F.2d 308, 315 (9th Cir. 1978)

**DISCUSSION**

## I.   LIKELIHOOD OF SUCCESS ON THE MERITS

The Klamath Tribes must establish their likelihood of success on the merits under the standards of the APA. *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 601 (9th Cir. 2014) (stating that ESA claims reviewed "under the standards of the APA"). Review of agency action is permitted to determine whether the action is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Agency action is "arbitrary and capricious if the agency has . . . offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of United States, Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). While this is a close case, I do not find that the claims are likely to succeed on the merits on the current record.

### A.   Count I: Unlawful Take Under ESA Section 9

The Klamath Tribes assert that the Bureau's "management of [Upper Klamath Lake] elevations below [FWS] Critical Elevations during spring and early summer spawning season has resulted in consistent, harmful reduction in the amount of C'waam and Koptu spawning substrate

and nursery habitat." PI Mot. at 32. *See Palila v. Haw. Dep't of Land and Natural Res.*, 852 F.2d 1106 (9th Cir. 1988) (upholding district court finding of a taking where the state allowed sheep to degrade an endangered bird species' habitat).

It is unlawful to take any endangered species in the United States. 16 U.S.C. § 1538(a)(1)(B). "Take" means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, collect, or attempt to do any of these actions. *Id.* at § 1532(19). Federal regulation defines "harm" similarly, as "an act which actually kills or injures wildlife" including "significant habitat modification or degradation…by significantly impairing essential behavioral patterns, including breeding, feeding, or sheltering." 50 C.F.R. § 17.3; *accord Marbled Murrelet v. Babbitt*, 83 F.3d 1060, 1067 (9th Cir. 1996) ("[A] habitat modification which significantly impairs the breeding and sheltering of a protected species amounts to 'harm' under the ESA.").

The federal defendants make three major arguments against the likelihood that Count I will succeed on the merits. First, the Bureau asserts that there is no evidence it caused more incidental take than what is exempt in the ITS. Federal Opp. at 15. Next, the federal defendants claim that the Klamath Tribes cannot show any violation of ITS terms and conditions 1c of the 2013 BiOp ("T&C 1c") requiring the Bureau to give "special scrutiny," "whenever operations cause [Upper Klamath Lake] elevations to trend downwards towards the [2013 BiOp elevation] thresholds." 2013 BiOp at 394. Finally, federal defendants contend that the ITS still applies, and exempts incidental take, since there is no evidence that the Bureau failed to comply with any terms and conditions of the ITS. Federal Opp. to PI at 24.

### 1.    Was There Likely a Take Exceeding the ITS?

The Klamath Tribes argue that Project operations have exceeded the take permitted by the ITS and the scope of the 2013 BiOp, triggering a violation of Section 9 of the ESA. *See, e.g., Wild Fish Conservancy v. Salazar*, 628 F.3d 513, 531 (9th Cir. 2010) ("Incidental Take Statements set forth a 'trigger' that, when reached, results in an unacceptable level of incidental take, invalidating the safe harbor provision.").

The federal defendants assert that there is no evidence they caused more incidental take than what is exempt in the ITS. Federal Opp. to PI Mot. ("Federal Opp.") at 15 (Dkt. No. 44).

The data provided from the 2013 to 2015 annual incidental take reports show the amount of estimated incidental take was less than anticipated in the original ITS. *See id*. at 15-16. Of the entire incidental take during 2013 to 2015 seasons, only once in the 2015 season did take surpass estimates. This occurred only for take caused by implementing conservation measures, and still the overall number of sucker fish estimated to be harmed was less than anticipated in the 2013 BiOp. *Id*. at 16, n. 7; Ex. G at 11, Table 1. After 2015, FWS issued the Bureau an amended ITS to account for updated models of water flow. *Id*. at 15, n. 4; Ex. D at 2. The take data from 2016 and 2017 seasons never exceeded the ITS in any measured category. *Id*. at 17.

The Klamath Tribes respond that take estimates are incorrect because the Bureau arbitrarily claims no harm to sucker fish in the category "Seasonal Habitat Reductions Owing to Water Diversions and End-of-Season Flow Reductions." *See* Combined Reply to Opps. ("PI Reply") at 14. The 2013 BiOp estimated 50,000 sucker fish could be harassed and 5,000 harmed in this category. 2013 BiOp § 13.2.1.6. The Bureau noted they lacked data to develop an estimate, but that it could not have exceeded take in this category if it operated the Project consistent with the effects analysis of the 2013 BiOp. Federal Opp. at 16 n. 6. Whether they are operating within the assumptions of the 2013 BiOp is a significant dispute, despite that the Klamath Tribes repeatedly claimed they are not challenging the validity of the 2013 BiOp.

Nonetheless, the Klamath Tribes have provided some evidence that the take estimates are not wholly accurate. *See* PI Mot., Ex. C ¶ 103; PI Reply, Ex. A at ¶¶ 16-19. Certainly on the basis of plaintiff's own estimates, take could not be zero for seasonal habitat reduction. But the Ninth Circuit cases suggest that the Klamath Tribes must show that the Bureau likely violated the terms and conditions of the ITS to connect any excessive take to a violation of Section 9. *See Bennett*, 520 U.S. at 170 ("the Biological Opinion's Incidental Take Statement constitutes a permit authorizing the action agency to 'take' the endangered or threatened species so long as it respects the Service's 'terms and conditions.'").

## 2. Was There a Violation of the ITS Terms and Conditions?

As I discussed in the *Yurok* case, it is "unclear exactly when or how the safe harbor provision of an incidental take statement becomes invalid after the incidental take trigger is met

and how courts should analyze a subsequent Section 9 claim." *Yurok Tribe*, 231 F. Supp. 3d at 463. The Ninth Circuit has indicated that exceeding take requires the relevant agencies to reinitiate formal consultation. *Wild Fish Conservancy v. Salazar*, 628 F.3d 513, 531 (9th. Cir. 2010) (*quoting Ariz. Cattle Growers' Ass'n*, 273 F.3d at 1249) ("Incidental Take Statements set forth a 'trigger' that, when reached, results in an unacceptable level of incidental take, invalidating the safe harbor provision."). Section 7(o) also allows the agency any level of take so long as the agency complies with the terms and conditions of the ITS. 16 U.S.C. § 1536(o)(2). Once it is shown that the terms and conditions of the ITS were violated once, "I cannot conclude that the safe harbor protects the Bureau for subsequent violations as well." *Yurok Tribe*, 231 F. Supp. 3d at 463.

Here, the Klamath Tribes argue that the Bureau violated T&C 1c by treating the 2013 BiOp thresholds as targets and failing to immediately determine if they were operating within the BiOp after assumptions proved false. *See Bennett*, 520 U.S. at 170 ("Thus, the Biological Opinion's Incidental Take Statement constitutes a permit authorizing the action agency to 'take' the endangered or threatened species so long as it respects the Service's 'terms and conditions.'").

T&C 1c requires monitoring of lake elevation levels and consulting and adapting to try to resolve any failures to meet the thresholds. 2013 BiOp at 394. If the Bureau fails to meet elevation thresholds, it "must identify the reasons for unexpected elevations and consult with the Services regarding implementation of potential adaptive management actions." *Id*. If adaptive management actions are unsuccessful "at avoiding threshold violations and the [FWS] does not accept the rationale for the violation or mitigation of the effects" then it is "outside of the [FWS] analysis." *Id*. Because FWS has never rejected the Bureau's rationale for violating the thresholds, the federal defendants argue they have never operated outside the scope of the 2013 BiOp and T&C 1c is not invalid.

In reply, the Klamath Tribes challenge the assumptions of the 2013 BiOp. Section 8.2 of the 2013 BiOp lists assumptions used in the analysis, which if "prove[n] false or warrant changes during Project implementation [ ] could affect the validity of this analysis, and potentially trigger re-initiation of ESA Section 7 consultation…" 2013 BiOp at § 8.2. One such assumption was that

periods of record for hydrology "represent the range and distribution of elevations that are reasonably likely to occur over the 10-year consultation." *Id.* Based on a letter in the *Yurok* and *Hoopa Valley* cases and an email between FWS and the Bureau, the Klamath Tribes argue that conditions have been outside the scope of the 2013 BiOp for some time now. PI Reply at 12. Specifically, in a July 2015 letter to NMFS the Bureau noted unprecedented drought conditions that were not anticipated in the BiOp, and in a May 2016 email they suspected a situation outside the period of record. *See Yurok Tribe*, 321 F. Supp. 3d at 474; Federal Opp. to PI, Ex P. at 1.

Even as reinitiated consultation has begun, the Klamath Tribes contend it is arbitrary and capricious to maintain elevations according to the 2013 BiOp levels, which is expected to happen according to the 2018 Operations Plan. *See* PI Reply at 14; Intervenors Opp. to PI Mot., Ex F. The federal defendants respond that they are reasonably relying on the 2013 BiOp because every time the thresholds were not met, T&C 1c was followed and FWS concluded that the BiOp was still valid. Specifically, T&C 1c accepts that conditions become "outside the scope of those analyzed in the 2013 BiOp" when there is a "progressive decrease" in elevation. *See* Federal Opp. to PI, Ex A. at 3. FWS did not find that the twelve instances when thresholds were not met was a progressive decrease as opposed to "isolated incidents." *Id.* And this finding resulted from following the procedures of T&C 1c. *Id.* ("Reclamation consulted with the Service on each of these missed thresholds. In each instance, the Service reviewed Reclamation's justification for these violations and concluded that the rationale was valid and therefore did not constitute discrete triggers of reinitiation of consultation.").

The federal defendants assign their early failures to meet thresholds to unforeseen circumstances several years ago. *See* Federal Opp. to PI, Ex K at ¶¶10-14. When eight of the twelve thresholds were missed in 2013, 2014, and 2015, the Bureau consulted with FWS and they were initially not able to determine why they could not meet the thresholds. *Id.* Ex L at 1. They formed a technical group to evaluate their methodology and did in fact make changes that they concluded would lead to results consistent with the 2013 BiOp. *Id.* at Ex. M at 2. The next drop below thresholds was in November 2015, and the technical group found that additional changes should be made. The Bureau proposed these changes to FWS, and the agency agreed that these

were necessary and within the scope of the 2013 BiOp once again. *Id*. Ex. K ¶ 7. In the last three instances when thresholds were not met in May 2016, and April and May 2017, the agencies continued to consult, determine the cause, and made changes accordingly. *Id*. Ex. K ¶¶ 13-14; Ex. A at 3-4.

While take, according to plaintiff's argument, is most likely to exceed the ITS when elevations are below thresholds, in each instance when thresholds were not met the Bureau has shown that it acted according to the T&C 1c and immediately consulted with FWS. The Klamath Tribes claim that consultation did not occur on two occasions in June 2013 and May 2016, but the evidence shows otherwise. *See* Federal Opp. to PI Mot., Ex. M ¶ 10 and Ex. P. FWS has not rejected the rationale provided by the Bureau when they failed to meet thresholds, and it continues to determine that the 2013 BiOp is still operative. For these reasons, the Klamath Tribes cannot demonstrate a past violation of T&C 1c, or an ongoing violation. With the safe harbor of the ITS still in force, plaintiff has not shown a likelihood of success on the merits of any future or imminent Section 9 unlawful take claim.

### B.     Count II: Jeopardy to Protected Species Under ESA Section 7

The Klamath Tribes contend that the Bureau failed to comply with ESA Section 7 by failing to maintain thresholds at or above BiOp levels and continuing to rely on the 2013 BiOp. Section 7 prevents agencies from taking any action that may jeopardize the survival of any listed species. It provides:

> Each federal agency shall, in consultation with and with the assistance of the Secretary, insure that any action authorized, funded, or carried out by such agency. . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined by the Secretary ... to be critical....

16 U.S.C. § 1536(a)(2). When the 2013 BiOp was completed it concluded that "the continued operation of the Project for a 10-year term is not likely to jeopardize the continued existence of the [sucker fish] or result in the destruction or adverse modification of their critical habitat." 2013 BiOp at § 10.5. The ITS was issued after FWS found that the proposed agency action, the 2013 BiOp, might result in incidental take of the sucker fish. *Id*. at 378.

The federal defendants' main argument is that the Klamath Tribes' jeopardy claim cannot succeed on the merits since the 2013 BiOp is entitled to a "presumption of regularity." *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 601 (9th Cir. 2014). They contend that since this claim is brought only against the Bureau, and not FWS who drafted the 2013 BiOp, FWS agency action is only relevant to the extent that the Bureau's reliance on it was arbitrary and capricious. *Pyramid Lake Paiute Tribe of Indians v. U.S. Dep't of Navy*, 898 F.2d 1410, 1415 (9th Cir. 1990) ("The FWS's actions, or lack thereof, in preparing its opinions are relevant on appeal only to the extent that they demonstrate whether the Navy's reliance on the reports is 'arbitrary and capricious.'").

The Section 7 jeopardy claim is undisputedly a challenge only to the Bureau's management and operation of the Project after the 2013 BiOp. PI Reply at 17. The Klamath Tribes do not dispute the cases presented by the federal defendants, but respond that the *Pyramid Lake* case also found agency reliance on consulting agency opinions turned on whether "a challenging party can point to [ ] 'new' information—i.e., information the Service did not take into account—which challenges the opinion's conclusions," and also considered "other data which undermines seriously the FWS's opinions." *Pyramid Lake Paiute Tribe of Indians*, 898 F.2d at 1415.

The information considered by the 2013 BiOp regarding its no-jeopardy conclusion for the sucker fish is stated in § 10 of the 2013 BiOp. *See* 2013 BiOp at 196. One basis for the no-jeopardy conclusion was their collaborative efforts to create a plan that would result in "higher seasonal [Upper Klamath Lake] elevations and greater certainty that elevation goals would be met compared to previous proposed actions." *Id*. § 10.6 at 196. But the 2013 BiOp found "substantial adverse effects would remain that could not be further minimized by modifying water management." *Id*. To overcome these adverse effects, their no-jeopardy conclusion assumed that there would be relocation of sucker fish to Upper Klamath Lake, and propagation to provide an immediate increase in reproduction. *Id*.

The 2013 BiOp also identified various conditions affecting the survival of the sucker fish, including:

> (1) adverse water quality (e.g., low DO, high ammonia, high pH, algal toxins, and urban and agricultural run-off) …; (2) … suckers in UKL are affected nearly every year by harsh conditions (e.g., low DO, high ammonia and pH, algal toxins, parasites, pathogens, and predators); (3) injury and mortality associated with entrainment …; (4) migration barriers such as dams prevent access to upstream spawning habitats …; additionally, adverse water quality and low flows could also act as seasonal barriers; (5) reductions in habitat quality and quantity resulting from diversion of water for agriculture seasonally …; and (6) the species are negatively affected by range-wide reductions in habitat quality and quantity owing to droughts associated with natural climate cycles and manmade climate change.

2013 BiOp § 10.1 at 190. It goes on to mention that "[s]pecific factors limiting [sucker fish] recovery in [Upper Klamath Lake] include higher than natural mortality of age-0 juveniles due to degraded water quality, algal toxins, disease, parasites, predation, competition with native and introduced species, and entrainment into water management structures." *Id*. at 189. Adult sucker fish are faced with "severely-impaired water quality, and the fact that adult suckers are approaching the limits of their life span." *Id*. The 2013 BiOp recognized the severity of this situation and that both species of sucker fish will be at a "high risk of extinction in the next 10 years without recruitment." *Id*. § 10.1 at 189.

The Klamath Tribes insist that the 2013 BiOp did not consider consistently low seasonal Upper Klamath Lake elevations and unexpectedly dry conditions. PI Reply at 17; PI Mot. 25-27, Ex. A ¶¶ 31-37. They rely on my order in the *Yurok* and *Hoopa Valley* case. The 2013 BiOp's assumption that *C. shasta* rates would decline in the period of record proved egregiously false, and the NMFS had not studied the impact on Coho salmon if *C. shasta* rose. *Yurok Tribe*, 231 F. Supp. 3d at 477. That triggered reconsultation. It was not tantamount to a finding that the 2013 BiOp was immediately invalidated; that was not the issue in the case.

This is a different case than in *Yurok* and *Hoopa Valley*. Here, the no-jeopardy finding for the sucker fish is based on the intent for the Project to result "in a proposed action that includes *higher* seasonal [Upper Klamath Lake] elevations and *greater certainty* that elevation goals would be met compared to previous proposed actions," rather than a clear-cut assumption about the sucker fish. 2013 BiOp § 10.6 at 196 (emphasis added). The 2013 BiOp considered the connection between elevation and water quality in Upper Klamath Lake, and analyzed seasonal threats to the sucker fish in three seasons: June to September, October, and November to May. *Id*.

22

at 72, Table 7.3. The 2013 BiOp found the June to September season was the most significant in terms of potential threats to the sucker fish due to water quality. *Id.* Of the twelve instances when thresholds were not met, only four occurred in the June to September season. *See* Federal Opp. Ex. K ¶ 6. Those four occasions occurred in 2013 and 2014 before FWS and the Bureau identified an issue with their model and modified it.

Related to Count I, the 2013 BiOp specifically included a procedure to minimize adverse impacts of the Project on sucker fish, and it accounted for potentially failing to meet elevation levels. 2013 BiOp § 10.2 at 191. When the elevation thresholds were not met, the Bureau identified the reasons for missing thresholds and whether they were within the scope of the BiOp, and then consulted with FWS. Federal Opp. to PI Mot. at 25. FWS accepted the Bureau's determination after consultation on each occasion, also concluding that conditions still operated within those analyzed by the 2013 BiOp. *Id.* Without evidence that new information was not considered when the Bureau determined to continue operating under the 2013 BiOp for setting Upper Klamath Lake elevations, it is not likely their actions were arbitrary or capricious. The Klamath Tribes do not provide sufficient evidence that the no-jeopardy conclusion made by FWS was based on specific assumptions that have proven false. Rather, the intent for higher seasonal elevation levels and greater certainty that elevations are met remains in place. Accordingly, the Klamath Tribes have not shown a likelihood of success on their Section 7 jeopardy claim.

**C.      Count III: Failure to Reinitiate Adequate Consultation Under ESA Section 7**

The Klamath Tribes bring another ESA Section 7 claim, contending that the federal defendants failed to reinitiate adequate consultation after conditions surrounding the Project exceeded the scope of the 2013 BiOp. 16 U.S.C. § 1540(g)(1) requires reinitiation of formal consultation in four circumstances, but particularly relevant in this case is if "the amount or extent of taking specified in the incidental take statement is exceeded." 50 C.F.R. § 402.16. The inquiry is simply whether the amount of take specified in the ITS was exceeded, and therefore triggered a mandatory duty to reinitiate consultation of the Project's impact on the sucker fish.

The Klamath Tribes argue that they are likely to prevail because the Project conditions have exceeded the scope of the 2013 BiOp. After reviewing the assumptions of the 2013 BiOp

and the risks to the sucker fish considered in the BiOp, I do not conclude that the 2013 BiOp is likely invalid or that the Bureau is operating outside its scope by continuing to abide by a valid BiOp. The information that the Klamath Tribes insists took the Bureau outside the scope of the BiOp, lower elevations and dryer conditions than expected, was a possibility considered when FWS determined the ITS and no-jeopardy finding. Additionally, FWS determined that the Bureau was still within the scope of the 2013 BiOp after following the adaptive management procedures in T&C 1c.

The Klamath Tribes contend that the Bureau exceeded the numerical take exempted in the ITS. I agree that take is not equal to zero for "Seasonal Habitat Reductions Owing to Water Diversions and End-of-Season Flow Reductions," but the Klamath Tribes' evidence does not go further to establish it is beyond the ITS exemption. PI Mot., Ex. C ¶ 103; PI Reply, Ex. A at ¶¶ 16-19. Without showing that take exceeds the ITS, the Klamath Tribes are not likely to succeed on a reinitiation of consultation claim. It is admittedly a close call, and the expert debate about whether take was exceeded poses a serious question on the merits of this issue. *See Cascadia Wildlands v. Scott Timber Co.*, 715 F. App'x 621, 624 (9th Cir. 2017) ("Since the district court found that both parties plausibly rely on qualified experts who differ on whether a taking will occur, this Court agrees that the "serious questions" standard is met.").

## II.    IRREPARABLE HARM

To sustain a request for a preliminary injunction, the Klamath Tribes must also demonstrate that "irreparable injury is likely in the absence of the requested injunction." *Winter v. Natural Res. Def. Council, Inc*., 555 U.S. 7, 22 (2008) (internal quotations omitted). Based on the presumptively valid 2013 BiOp, and competing expert opinions regarding the harm caused by lower elevations, I do not find that they have met their burden here.

The federal defendants and intervenors assert that the Klamath Tribes fail to show that the sucker fish will be irreparably harmed absent the requested relief before the end of this litigation. *See S. Yuba River Citizens League v. NMFS*, No. 2:13-cv-00059, 2013 WL 4094777, *7 (E.D. Cal. Aug 13, 2013). The FWS experts opined in their Technical Report that the 2013 BiOp was valid, and that continuing to operate according to its thresholds "is not likely to cause jeopardy or

24

adverse modification of critical habitat" to the sucker fish. Federal Opp., Ex. A at 3-4. The federal defendants provide experts who challenge whether conservation level elevations the Klamath Tribes request are needed to avoid harm to the sucker fish. *See id.*, Ex. T ¶¶17-20 ("It is widely agreed that the principal factor limiting the recovery of the species is the lack of juvenile suckers surviving their first year of life," and this problem has occurred "across a range of lake elevations."). Amicus curiae for Siskiyou County also provide other expert testimony, highlighting the uncertainty in literature that higher lake elevations will have a positive impact on the sucker fish. *See* Amicus Curiae Brief at 15 (Dkt. No. 49).

The Klamath Tribes come up short in their response. Plaintiff's offer expert opinion on the possibility of an imminent and catastrophic die-off, and cite research suggesting causation between water quality and elevations at Upper Klamath Lake. PI Mot. Ex. C ¶¶ 108-166. But it is not clear that the current elevations, found to be consistent with the 2013 BiOp's no-jeopardy finding, will irreparably harm the sucker fish. It is also an open question among competing expert opinions whether the relief requested will really improve the plight of the sucker fish. There is no dispute, as intervenors note, that "current populations could become extinct in the next decade if there is no major recruitment event soon," which is a consideration noted in the 2013 BiOp. *See* Intervenors Opp. at 39 (citing PI Mot. Ex. C ¶ 29). But the Klamath Tribes' own expert opinion does not overcome a significant dispute whether elevations are dispositive measures of a benefit or harm to the sucker fish.

The Klamath Tribes contend that at the current BiOp thresholds, the sucker fish are at continued risk of disease and entrainment. Again, this was identified in the 2013 BiOp, which still found the thresholds appropriate and made a no-jeopardy finding with respect to the sucker fish. Next, plaintiff invokes the *Yurok* case, which did not presume that the 2013 BiOp was valid with respect to Coho salmon since reinitiation of consultation was mandatory. 231 F.Supp.3d at 477. In this case, however, the federal defendants were not mandated to reconsult on the Project's effect on the sucker fish but have represented that they voluntarily began reconsultation with respect to the sucker fish species. *Id.* (discussing other cases where "because the agencies voluntarily reinitiated consultation in those cases, the decision did not necessarily evidence flaws

in the underlying biological findings or assumptions."). The 2013 BiOp's presumption of regularity with respect to the sucker fish remains untarnished. Given the circumstances, there is not sufficient evidence that the sucker fish will face irreparable harm absent a preliminary injunction before the resolution of this litigation.

### III. BALANCE OF EQUITIES AND PUBLIC INTEREST

In the context of the ESA, "the balance of hardships and the public interest tips heavily in favor of protected species." *See Nat'l Wildlife Fed. v. Burlington N.R.R., Inc.*, 23 F.3d 1508, 1510–11 (9th Cir. 1994); *see also Nat'l Marine Wildlife Fed'n.*, 886 F.3d at 817 ("When considering an injunction under the ESA, we presume . . . that the balance of interest weighs in favor of protecting endangered species, and that the public interest would not be disserved by an injunction."). The Klamath Tribes insist that accordingly, "the ESA strips courts of at least some of their equitable discretion in determining whether injunctive relief is warranted," *Cottonwood Envt'l Law Ctr. v. U.S. Forest Serv.*, 789 F.3d 1075, 1088 (9th Cir. 2015), and "removes" the balance of hardships and public interest factors from my "equitable discretion." *Nat'l Marine Wildlife Fed'n*, 886 F.3d at 817; *accord Cottonwood*, 789 F.3d at 1090.

As an initial challenge to injunctive relief, the federal defendants assert that the Klamath Tribes failed to diligently pursue its claims since Upper Klamath Lake first fell below the threshold elevation levels as early as June 2013. *See Benisek v. Lamone*, 138 S. Ct. 1942, 1944 (2018) ("[i]n considering the balance of equities among the parties, we think that plaintiffs' unnecessary, years-long delay in asking for preliminary injunctive relief weighed against their request."). This argument is weak. It is true there was a delay of several years from the date of the first failure to meet the 2013 BiOp thresholds and this lawsuit, but that does not inform whether the sucker fish were at the same risk of extinction as the Klamath Tribes allege they are now, and there is no dispute that the Klamath Tribes have been involved in the consultations concerning the jeopardy to the sucker fish in the Upper Klamath Lake. A lack of diligence by the Klamath Tribes, even if true, would not tip the balance of equities and public interest away from protecting the endangered sucker fish if needed.

Next, the federal defendants argue that the requested relief places the needs of the sucker

26

fish against a host of other interests. The Bureau explained that because of the 2017 injunction protecting Coho salmon, meeting the Klamath Tribes' requested lake elevations in the future would not be possible without reducing the Project water supply. Federal Opp. to PI, Ex. K ¶ 26. They claim that meeting the elevation requests would lead to human safety concerns, "including conflict with flood control operations and a risk of private levee failure." *Id*. ¶ 26. Moreover, if the Project is shutoff and water delivery ceases it would lead to economic losses to migrating waterfowl, and substantial crop loss approximately worth $380 million. *Id*. ¶¶ 19, 21.

Intervenors assert their own interests as well, noting that the injunction would not only reduce water available for crops but prompt a mid-season shutoff that would financially ruin farmer families. Intervenors Opp. at 40. As I was limited in the *Yurok* and *Hoopa Valley* cases, I am limited here because typically the interests of the protected species outweigh those of farmers and ranchers. *See Klamath Water Users Protective Ass'n v. Patterson*, 204 F.3d 1206 (9th Cir. 1999) ("[T]he Irrigators' rights to water are subservient to the ESA"). Courts are not permitted to favor economic interests over potential harm to endangered species. *Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 184 (1978) ("The plain intent of Congress in enacting this statute was to halt and reverse the trend toward extinction whatever the cost."). Congress has established that "courts may not use equity's scales to strike a different balance." *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 422 F.3d 782, 793 (9th Cir. 2005); *Cottonwood*, 789 F.3d at 1091 ("[T]he equities and public interest factors always tip in favor of the protected species."). Yet, a mandatory preliminary injunction is an extraordinary remedy and I need to be certain that the remedy requested is likely to be effective. In that respect, I consider the intervenors' concerns and I recognize the complex interests that would be affected by preliminary relief.

This case presents competing expert opinions on the effectiveness of the remedy, which is concerning in light of the magnitude of interests that would be affected by the preliminary injunction. The federal defendants contend that since there is a dispute about whether elevation levels will help the species, the balance of equities and public interest does not weigh in plaintiff's favor. *Ctr. for Biological Diversity v. U.S. Bureau of Reclamation*, No. 6:15-CV-02358-JR, 2016 WL 9226390, at *5 (D. Or. Apr. 6, 2016) ("Given the genuine dispute among relevant experts as

to whether plaintiffs' proposal will remedy the harm allegedly caused by the dams' operations, plaintiffs fail to show that the requested relief will, in fact, benefit the spotted frog pending resolution of this case."). It is "not the court's role to pick and choose among expert opinions," *Ctr. for Biological Diversity*, 2016 WL 9226390, at *5, but the fact that there are substantial competing expert opinions weakens plaintiff's argument that their proposed remedy will benefit the sucker fish.

The Klamath Tribes have failed to show that their proposed remedy is in the sucker fish's best interest. In a case where there remains a valid 2013 BiOp, where there are competing expert opinions on the take exceedance and the harm actually caused by lower lake elevations, and where there are competing expert opinions on the remedy offered by higher elevations, a mandatory preliminary injunction is inappropriate. Even if the balance of equities and public interest remained slightly in the Klamath Tribes favor, I could not grant the preliminary injunction on that basis alone. As discussed above, plaintiff has not shown a likelihood of success on the merits of its claims on this record, or a clear irreparable injury to the sucker fish in the absence of immediate relief while the Bureau operates according to the 2013 BiOp.

At the hearing, plaintiff proposed an alternative remedy that I direct a specific technical process to occur between the parties to consider new science and analyze the existing lake levels. I understand that waiting for the reconsultation to finish while maintaining the status quo is troublesome to the Klamath Tribes. But I will let the transferee judge determine the appropriate course of action while this case progresses.

## CONCLUSION

The federal defendants' and intervenors' motions to dismiss for improper venue are DENIED, but their motions to transfer venue are GRANTED. The District Court for the District of Oregon is the appropriate venue for this matter. The Klamath Tribes' motion for preliminary injunction is DENIED.

The Clerk shall transfer the file the United States District Court for the District of Oregon.

**IT IS SO ORDERED.**

Dated: July 25, 2018

William H. Orrick
United States District Judge